Mikaela C. Gallagher-Whitman (SBN 338622)
MWhitman@PasichLLP.com
Daria Clecicov (SBN 340760)
DClecicov@PasichLLP.com
PASICH LLP
1230 Rosecrans Avenue, Suite 690
Manhattan Beach, California 90266
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EMPOWER FINANCE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>BEAZLEY INSURANCE COMPANY, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR BREACH OF CONTRACT; TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

PASICH LLP

Plaintiff Empower Finance, Inc. ("Empower Finance") brings this action against defendant Beazley Insurance Company, Inc. ("Beazley") and alleges as follows:

**NATURE OF THIS LAWSUIT**

1. This is an insurance coverage dispute under a "claims-made and reported" insurance policy arising from two separate and distinct lawsuits against the insured, Empower Finance. On December 16, 2022, Empower Finance was served with a 16-page complaint filed in the United States District Court for the Northern District of New York by Empower Federal Credit Union ("Federal Credit"), alleging eight causes of action under the Lanham Act, New York common law, and New York unfair competition statutes.[1] Then, on January 9, 2023, Empower Finance was sued in the United States District Court for the District of Colorado by Empower Annuity Insurance Company of America ("EAICA") in a 34-page complaint alleging five causes of action under the Lanham Act, Colorado common law, and Colorado unfair competition statutes.[2] Federal Credit is not related in any way to EAICA. Federal Credit is a federally chartered credit union with no shareholders and no parent company.[3] EAICA is part of a financial conglomerate, ultimately owned by Power Corporation of Canada, which is publicly traded on the Toronto Stock Exchange.[4] Thus, the underlying lawsuits are completely independent, involving the rights of two distinct plaintiffs, seeking relief under the laws of separate states, and alleging different injuries. The only overlap is that the two plaintiffs also use the word "Empower" in offering their services, just as Empower Finance does.

2. Empower Finance tendered both the New York Lawsuit and the Colorado Lawsuit to its insurer, defendant Beazley, which does not dispute that both of the lawsuits contain allegations that would trigger coverage under the December 10, 2022–December 10, 2023, Media

---

[1] *Empower Federal Credit Union v. Empower Finance, Inc.*, No. 5:22-cv-01302 (N.D.N.Y. Dec. 5, 2022) (the "New York Lawsuit").

[2] *Empower Annuity Insurance Co. of America v. Empower Finance, Inc.*, No. 1:23-cv-00062 (D. Colo. Jan. 9, 2023) (the "Colorado Lawsuit").

[3] New York Lawsuit, ECF No. 2.

[4] Colorado Lawsuit, ECF No. 3.

PASICH LLP

Tech insurance policy that Beazley sold to Empower Finance. However, Beazley now attempts to avoid all of its coverage obligations for both lawsuits, incorrectly asserting that (i) an October 2022 letter from Federal Credit to Empower Finance constituted a "claim" under the prior Media Tech policy, such that Empower Finance's tender of the New York Lawsuit was untimely, and (ii) the Colorado Lawsuit is "related" to the New York Lawsuit, and thus, also untimely.

3. Beazley is fighting vigorously for the lawsuits to be "related" and have them both be deemed to be "claims" first made in the 2021–22 policy year because if the lawsuits are "related," Beazley believes it can shirk *all* responsibility for *both* lawsuits. In short, Beazley seeks to deprive its insured of all the coverage it paid for by blatantly mischaracterizing the lawsuits and the meaning of "related" under the terms of the policy and the law. Beazley's behavior is egregious.

4. By this lawsuit, Empower Finance seeks a declaration of its rights under the 2022–2023 Media Tech insurance policy and to recover the policy benefits to which it is entitled, plus interest, attorneys' fees, and punitive damages.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on complete diversity of citizenship and because the amount in controversy, exclusive of costs and interest, exceeds $75,000.

6. This Court has personal jurisdiction over Beazley pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because Beazley has engaged in transactions or business within this state from which this action arises and it is licensed to do business in this state.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## THE PARTIES

8. Empower Finance is a Delaware corporation with its principal place of business in San Francisco, California. Empower Finance provides financial services, including automated savings, interest checking and cash advance, easy budgeting and spend tracking.

9. Empower Finance is informed and believes, and on that basis alleges, that Beazley is a Connecticut corporation with its principal place of business in Connecticut.

PASICH LLP

10.     Empower Finance is informed and believes, and on that basis alleges, that Beazley is, and holds itself out as being, extremely sophisticated and knowledgeable in insuring media liability losses and in investigating the risks that it insures.  Empower Finance is informed and believes, and on that basis alleges, that Beazley participates in a wide range of media liability programs and holds itself out as being knowledgeable, experienced, and reliable, and willing to insure, and capable of insuring, substantial media liability losses.

11.     Beazley makes various representations in advertising, and in public statements.  Beazley poses this question on its website: "How do we define our culture?"  It answers: "By our brand and values – being bold, striving for better and doing the right thing."[5]

12.     By "doing the right thing," Beazley emphasizes that

> [a]cting with integrity in a straightforward, decent way is instinctive. Open and honest with others, we show respect and empathy however challenging the situation – demonstrated by our multi-award winning claims team. Doing the right thing makes for a fair-minded, rewarding environment and makes work and life better for all.[6]

13.     Beazley represents on its website that "doing good is a start, but we go all out for better."[7]

14.     Beazley's website contains a section on the media liability products that it offers and poses the question: "How can we help?"  In response, it answers:

- Specialist underwriting team with extensive media and entertainment experience
- Straightforward policy wordings with clear and concise language
- Integrated risk protection package
- Addresses the fast-changing world of digital media
- Award winning in-house claims expertise

---

[5] https://www.beazley.com/en-US/who-we-are/culture-and-values/

[6] https://www.beazley.com/en-US/products/specialty-risk-usa/media-liability

[7] https://www.beazley.com/en-US/who-we-are/bringing-different-to-life/

- Flexibility in choice of counsel.[8]

**THE MEDIA TECH POLICY ISSUED BY BEAZLEY**

15. Beazley issued Media Tech Insurance Policy No. VG00002419AD ("the Policy") to Empower Finance for the period of December 10, 2022, to December 10, 2023. Subject to a retention of $25,000 per claim, the Policy provides $3,000,000 in coverage for each "Media Wrongful Act." A true and correct copy of the Policy is attached hereto as **Exhibit A**.

16. The Policy defines "Media Wrongful Act" to include "dilution or infringement of trademark or service mark." Ex. A, Definitions.

17. The Policy obligates Beazley to "provide coverage on a claims made and reported basis and apply only to claims first made against the insured during the policy period . . . and reported to the Underwriters in accordance with the terms of this policy." *Id.*, Introduction.

18. The Policy provides that claims are to be notified to Beazley "as soon as practicable, but in no event later than: (i) 60 days after the end of the Policy Period . . . ." *Id.*, General Conditions.

19. The Policy defines "Claim" to mean, in relevant part,

> 1. a written demand received by any Insured for money, services, or any non-monetary or injunctive relief; and
>
> 2. a civil proceeding against any Insured commenced by service of a complaint or similar proceeding.

*Id.*, Definitions.

20. The Policy states that "[m]ultiple Claims arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single Claim for the purposes of this Policy. All such Claims will be deemed to have been made at the time of the first such Claim." *Id.*

21. The Policy's Notice of Circumstances provision states:

> With respect to any circumstance that could reasonably be the basis for a Claim, the Insured *may* give written notice of such

[8] https://www.beazley.com/en-US/products/specialty-risk-usa/media-liability

> circumstance to the Underwriters . . . Any subsequent Claim made against the Insured arising out of any circumstance reported to Underwriters in conformance with the foregoing will be considered to have been made at the time written notice complying with the above requirements was first given to the Underwriters during the Policy Period.

*Id.*, General Conditions (emphasis added).

22. The Policy defines "Loss" to mean:

> Breach Response Costs, Business Interruption Loss, Claims Expenses, Criminal Reward Funds, Cyber Extortion Loss, Damages, Data Recovery Costs, Dependent Business Loss, PCI Fines, Expenses and Costs, Penalties, loss covered under the eCrime insuring agreement and any other amounts covered under this Policy.
>
> Any Loss arising from the same or a series of related, repeated or continuing acts, errors, omissions, incidents or events will be considered a single Loss for the purposes of this Policy. . . .

*Id.*, Definitions.

## THE NEW YORK LAWSUIT

23. Empower Finance is informed and believes, and on that basis alleges, that Federal Credit is a federally chartered credit union having an address of 1 Member Way, Syracuse, New York, 13212.

24. On December 5, 2022, Federal Credit filed the New York Lawsuit against Empower Finance in the United States District Court for the Northern District of New York. The New York Lawsuit alleged: (1) Service Mark Infringement under the Lanham Act; (2) violation of New York Common Law Service Mark Infringement of "Empower;" (3) violation of New York Common Law State Unfair Competition and Palming Off; (4) Trademark Dilution Under N.Y. Gen. Bus. Law § 360-1; (5) Deceptive Trade Practices Under N.Y. Gen. Bus. Law § 349; and (6) Unfair Competition Under N.Y. Gen. Bus. Law §§ 349-35. A true and correct copy of the Complaint filed in the New York Lawsuit is attached hereto as **Exhibit B**.

25. On December 16, 2022, Empower Finance was served with Federal Credit's complaint in the New York Lawsuit.

PASICH LLP

26. Empower Finance reported the New York Lawsuit to Beazley on April 11, 2023, during the Policy's December 10, 2022, to December 10, 2023, policy period.

**THE COLORADO LAWSUIT**

27. Empower Finance is informed and believes, and on that basis alleges, that EAICA is a provider of financial services with its principal place of business in Greenwood Village, Colorado.

28. On January 9, 2023, EAICA filed the Colorado Lawsuit against Empower Finance in the United States District Court for the District of Colorado. The Colorado Lawsuit alleged: (1) Service Mark Infringement under the Lanham Act; (2) Common Law Trademark Infringement Under Colorado Law; (3) Common Law Unfair Competition Under Colorado Law; (4) Deceptive Business Practices Under Colorado Law Colo. Rev. Stat. § 6-1-105. A true and correct copy of the Complaint filed in the Colorado Lawsuit is attached hereto as **Exhibit C**.

29. On February 10, 2023, Empower Finance was served with EAICA's complaint in the Colorado Lawsuit.

30. Empower Finance reported the Colorado Lawsuit to Beazley on April 11, 2023, during the Policy's December 10, 2022, to December 10, 2023, policy period.

**BEAZLEY'S BREACHES OF ITS DUTIES**

**The New York Lawsuit**

31. Pursuant to the Policy's plain terms, the New York Lawsuit constitutes a "Claim" alleging a "Media Wrongful Act" against Empower Finance. Accordingly, it falls squarely within the Policy's coverage. However, without performing any meaningful investigation into Empower Finance's claims, and without regard to the breadth of coverage afforded under its Policy, Beazley unreasonably and incorrectly denied coverage.

32. Specifically, in denying coverage, Beazley incorrectly asserted that the New York Lawsuit was not timely reported because it "related" back to an October 14, 2022, letter from Federal Credit to Empower Finance and as a single "Claim," the October 14, 2022, letter and the New York Lawsuit were not timely reported. Beazley's position was and is contrary to the law and facts.

PASICH LLP

33. As a result of Beazley's wrongful denial, Empower Finance was forced to fund its own defense in the New York Lawsuit. To date, Empower Finance has paid substantial defense fees and costs incurred in connection with the New York Lawsuit, without any assistance from Beazley. Empower Finance continues to incur costs and legal fees in connection with its defense. Furthermore, through its wrongful denial of coverage, Beazley has repudiated its duty to indemnify Empower Finance in connection to the New York Lawsuit.

34. Through these actions, Beazley has breached its contractual obligations under the Policy and tortiously breached the Policy's implied covenant of good faith and fair dealing.

**The Colorado Lawsuit**

35. Pursuant to the Policy's plain terms, the Colorado Lawsuit constitutes a "Claim" alleging a "Media Wrongful Act" against Empower Finance. Accordingly, it falls squarely within the Policy's coverage. However, without performing any meaningful investigation into Empower Finance's claims, and without regard to the breadth of coverage afforded under its Policy, Beazley unreasonably and incorrectly denied coverage.

36. Specifically, in denying coverage, Beazley incorrectly asserted that the Colorado Lawsuit is a related "Claim" to the New York Lawsuit, which it said was deemed made before the Policy incepted and is therefore not covered. As a result of Beazley's wrongful denial, Empower Finance was forced to fund its own defense in the Colorado Lawsuit. To date, Empower Finance has paid substantial defense fees and costs incurred in connection with the Colorado Lawsuit, without any assistance from Beazley. Empower Finance continues to incur costs and legal fees in connection with its defense. Furthermore, through its wrongful denial of coverage, Beazley has repudiated its duty to indemnify Empower Finance in connection to the Colorado Lawsuit.

37. Through these actions, Beazley has breached its contractual obligations under the Policy and the Policy's implied covenant of good faith and fair dealing.

**FIRST CAUSE OF ACTION**

**(Breach of Contract)**

38. Empower Finance realleges and incorporates by reference paragraphs 1 through 37 above.

PASICH LLP

39. Beazley breached its duties under the Policy by denying coverage for Empower Finance's losses, and by otherwise acting as alleged above.

40. As a direct and proximate result of Beazley's breaches, Empower Finance has sustained, and continues to sustain, damages in excess of the Policy's retention and in excess of the jurisdictional requirements, plus interest at the legal rate. Empower Finance will seek leave to amend its complaint once Empower Finance ascertains the full extent of its damages.

**SECOND CAUSE OF ACTION**

**(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)**

41. Empower Finance realleges and incorporates by reference paragraphs 1 through 37 and 39 above.

42. Implied in the Policy was a covenant that Beazley would act in good faith and deal fairly with Empower Finance, that Beazley would do nothing to interfere with the rights of Empower Finance to receive benefits due under the Policy, and that Beazley would give at least the same level of consideration to Empower Finance's interests as it gave to its own interests.

43. Beazley also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to conduct a prompt and thorough investigation including all the bases that might support Empower Finance's claim for coverage, before asserting coverage defenses or denying coverage.

44. Instead of complying with these duties, Beazley acted in bad faith by, among other things,

a. Failing to perform a meaningful investigation into Empower Finance's claim for coverage for the lawsuits;

b. Failing and refusing to pay or reimburse Empower Finance's legal fees and costs incurred in connection with the defense of the lawsuits;

c. Asserting grounds for disputing coverage that they know are not supported by, and are contrary to, the terms of their Policies, the law, insurance industry custom and practice, the parties' course of dealings, and the facts;

PASICH LLP

d. Failing to fully inquire into possible bases that might support coverage for Empower Finance's losses;

e. By giving greater consideration to their own interests than Empower Finance's interests; and

f. By otherwise acting as alleged above.

45. In breach of the implied covenant of good faith and fair dealing, Beazley did the things and committed the acts alleged above for the purpose of consciously withholding from Empower Finance the rights and benefits to which it is and was entitled under the Policy. Beazley's acts are inconsistent with the reasonable expectations of Empower Finance, are contrary to established insurance industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the Policy, and constitute bad faith.

46. As a direct and proximate result of Beazley's acts, Empower Finance has sustained damages in excess of the Policy's retention, plus interest at the legal rate. Empower Finance continues to suffer damages because of Beazley's bad faith and will seek leave to amend its complaint once Empower Finance ascertains the full extent of its damages. Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), Empower Finance is entitled to recover attorneys' fees that it has previously incurred, and continues to incur, in its efforts to obtain the benefits due under the Policy that Beazley wrongfully withheld, and is withholding, in bad faith. Empower Finance also is entitled to interest thereon at the maximum legal rate.

47. Empower Finance is informed and believes, and on that basis alleges, that Beazley—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business—performed, authorized, or ratified the bad faith conduct alleged above.

48. Beazley's conduct has been done with a conscious disregard of Empower Finance's rights, constituting oppression, fraud, and/or malice. Beazley has engaged in a series of acts designed to deny Empower Finance the benefits due under the Policy. Specifically, Beazley, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously

PASICH LLP

disregarded Empower Finance's rights and forced Empower Finance to incur substantial financial losses, thereby inflicting significant financial damage on Empower Finance. Beazley ignored Empower Finance's interests and concerns with the requisite intent to injury within the meaning of California Civil Code section 3294. Therefore, Empower Finance is entitled to recover punitive damages from Beazley in an amount sufficient to punish and to make an example of Beazley and to deter similar conduct in the future.

## THIRD CAUSE OF ACTION

**(Declaratory Relief)**

49. Empower Finance realleges and incorporates by reference paragraphs 1 through 37 above.

50. Empower Finance contends that it is entitled to coverage for its losses under the Policy and that its contentions stated above are correct.

51. Empower Finance is informed and believes, and on that basis alleges, that Beazley disputes Empower Finance's contentions and contends that Empower Finance is not entitled to coverage under the Policy for any of its losses.

52. Therefore, an actual and justiciable controversy exists between Empower Finance and Beazley concerning the matters alleged herein.

53. Empower Finance seeks a judicial declaration by this Court in accord with its contentions and rejecting Beazley's contentions and stating that Empower Finance's losses are insured under the Policy.

54. A declaration is necessary at this time in order that the parties' dispute may be resolved and that they may be aware of their prospective rights and duties.

## PRAYER FOR RELIEF

WHEREFORE, Empower Finance prays for relief as follows:

## ON THE FIRST CAUSE OF ACTION

55. For damages according to proof at the time of trial, plus interest;

PASICH LLP

**ON THE SECOND CAUSE OF ACTION**

56. For damages according to proof at the time of trial, including reasonable attorneys' fees incurred in obtaining the benefits due under the Policy, plus interest; and

57. For punitive damages in an amount to be determined at the time of trial;

**ON THE THIRD CAUSE OF ACTION**

58. For a declaration in accord with Empower Finance's contentions stated above;

**ON ALL CAUSES OF ACTION**

59. For the costs of this lawsuit; and

60. For such other, further, and/or different relief as the Court may deem just and proper.

DATED: November 22, 2023 PASICH LLP

By: */s/ Mikaela C. Gallagher-Whitman*
Mikaela C. Gallagher-Whitman
Daria Clecicov
Attorneys for Plaintiff

PASICH LLP

**DEMAND FOR JURY TRIAL**

Plaintiff Empower Finance hereby demands a trial by jury in this action.

DATED: November 22, 2023

PASICH LLP

By: */s/ Mikaela C. Gallagher-Whitman*
Mikaela C. Gallagher-Whitman
Daria Clecicov
Attorneys for Plaintiff

PASICH LLP

# EXHIBIT A



# Beazley MediaTech

**THIS POLICY'S LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

These Declarations along with the statements contained in the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Policy, and the Policy with endorsements shall constitute the contract between the **Insureds** and the Underwriters.

## GENERAL INFORMATION

| | |
|---|---|
| **Insurer/Underwriter:** | Beazley Insurance Company, Inc. (Admitted) |
| **Named Insured:** | Empower Finance Inc |
| **Named Insured Address:** | 660 York Street<br>Suite 102<br>San Francisco, CA 94110-2804 |
| **Notice of Claim, Loss or Circumstance:** | Beazley Group<br>Attn: Cyber & Tech Claims Group<br>45 Rockefeller Plaza, 16th floor<br>New York, NY 10111<br>**cyber&techclaims@beazley.com** |
| **Administrative Notice:** | Beazley USA Services, Inc.<br>30 Batterson Park Road<br>Farmington, CT 06032<br>Tel: (860) 677-3700<br>Fax: (860) 679-0247 |

## POLICY INFORMATION

| | |
|---|---|
| **Policy Number:** | VG00002419AD |
| **Policy Form:** | Beazley MediaTech (F00731 022019 ed.) |
| **Policy Period:** | From: 10-Dec-2022 To: 20-Dec-2023<br>Both at 12:01 AM Local Time at the Named Insured Address |
| **Retroactive Date:** | 10-Dec-2019 |
| **Continuity Date:** | 10-Dec-2019 |
| **Optional Extension Period:** | 12 Months |
| **Optional Extension Premium:** | 100% of the Annual Policy Premium |
| **Waiting Period:** | 8 Hours |
| **Premium:** | $57,227.00 |

| COVERAGE SCHEDULE (Currency in USD) | | |
|---|---|---|
| | **Limit** | **Retention** |
| **Each Claim Limit of Liability:** | | |
| *Media, Tech, Data & Network Liability:* | $3,000,000 | |
| **Policy Aggregate Limit of Liability:** | $3,000,000 | |
| **Additional Defense Limit:** | Not Included | |
| **Media, Tech, Data & Network Liability** | | |
| Tech & Professional Services: | $3,000,000 | each Claim $25,000 |
| Tech Product: | $3,000,000 | each Claim $25,000 |
| Media: | $3,000,000 | each Claim $25,000 |
| Data & Network: | $3,000,000 | each Claim $25,000 |
| **Breach Response** | | |
| Breach Response Costs: | $3,000,000 | each incident $0 |
| **Regulatory Defense & Penalties** | | |
| Regulatory Defense & Penalties: | $3,000,000 | each Claim $25,000 |
| **Payment Card Liabilities & Costs** | | |
| Payment Card Liabilities & Costs: | $3,000,000 | each Claim $25,000 |
| **First Party Data & Network Loss** | | |
| Business Interruption Loss: | | |
| *Resulting from Security Breach:* | $2,000,000 | each incident $25,000 |
| *Resulting from System Failure:* | $2,000,000 | each incident $25,000 |
| Dependent Business Loss: | | |
| *Resulting from Dependent Security Breach:* | $100,000 | each incident $25,000 |
| *Resulting from Dependent System Failure:* | $100,000 | each incident $25,000 |
| Cyber Extortion Loss: | $2,000,000 | each incident $25,000 |
| Data Recovery Costs: | $2,000,000 | each incident $25,000 |
| **eCrime** | | |
| Fraudulent Instruction: | $250,000 | each loss $25,000 |
| Funds Transfer Fraud: | $250,000 | each loss $25,000 |
| Telephone Fraud: | $250,000 | each loss $25,000 |
| **Criminal Reward** | | |
| Criminal Reward: | $50,000 | |

## ENDORSEMENTS EFFECTIVE AT INCEPTION

| | | |
|---|---|---|
| 1. | E12287 022019 ed. | Asbestos, Pollution and Contamination Exclusion Endorsement |
| 2. | A01765CA 022019 ed. | California Amendatory Endorsement |
| 3. | BICMU05090406 | Nuclear Exclusion |
| 4. | E02804 032011 ed. | Sanction Limitation and Exclusion Clause |
| 5. | E12254 022019 ed. | War and Civil War Exclusion |
| 6. | E12228 022019 ed. | Aggregate/Maintenance Retention |
| 7. | E12266 022019 ed. | Amend Definition of Fraudulent Instruction |
| 8. | E12289 022019 ed. | Computer Hardware Replacement Cost |
| 9. | E12290 022019 ed. | Contingent Bodily Injury With Sublimit Endorsement |
| 10. | E12864 042019 ed. | Crisis Management Expense Coverage |
| 11. | E12972 052019 ed. | CryptoJacking Endorsement |
| 12. | E13916 052020 ed. | Employee Device Endorsement |
| 13. | E12269 022019 ed. | GDPR Cyber Endorsement |
| 14. | E12293 022019 ed. | Invoice Manipulation Coverage |
| 15. | E12716 022019 ed. | Post Breach Remedial Services Endorsement |
| 16. | E13040 062019 ed. | Reputation Loss |
| 17. | E13373 092019 ed. | State Consumer Privacy Statutes Endorsement |
| 18. | E12251 022019 ed. | Amend Definition of Additional Insured to Include Scheduled Entities |
| 19. | E12974 052019 ed. | Delete Coverage For Professional Services |

Authorized Representative

13-Dec-2022
Date

Secretary

President



# Beazley MediaTech

## TABLE OF CONTENTS

**INSURING AGREEMENTS** 1

Media, Tech, Data & Network Liability 1
Breach Response 1
Regulatory Defense & Penalties 1
Payment Card Liabilities & Costs 1
First Party Data & Network Loss 2
eCrime 2
Criminal Reward 2

**DEFINITIONS** 2

Additional Insured 2
Breach Notice Law 3
Breach Response Costs 3
Business Interruption Loss 3
Claim 4
Claims Expenses 4
Computer Systems 4
Continuity Date 5
Control Group 5
Criminal Reward Funds 5
Cyber Extortion Loss 5
Damages 5
Data 6
Data Breach 6
Data & Network Wrongful Act 6
Data Recovery Costs 6
Dependent Business 6
Dependent Business Loss 6
Dependent Security Breach 7
Dependent System Failure 7
Digital Currency 7
Extortion Payment 7
Extortion Threat 7
Extra Expense 7
Financial Institution 7
Forensic Expenses 8
Fraudulent Instruction 8
Funds Transfer Fraud 8
Income Loss 9
Individual Contractor 9
Insured 9
Insured Organization 10
Loss 10
Media Activities 10
Media Material 10
Media Wrongful Act 10
Merchant Services Agreement 11
Money 11
Named Insured 11
PCI Fines Expenses and Costs 11
Penalties 11
Period of Restoration 11
Personally Identifiable Information 12
Policy Period 12
Privacy Policy 12
Privacy Policy Violation 12
Professional Services 12
Regulatory Proceeding 13
Retroactive Date 13
Securities 13
Security Breach 13
Subsidiary 13
System Failure 13
Tech Products 14
Tech & Professional Services Wrongful Act 14
Tech Product Wrongful Act 14
Tech Services 14
Telephone Fraud 14
Third Party Information 14
Transfer Account 14
Unauthorized Access or Use 14
Unauthorized Disclosure 14
Waiting Period 15

**EXCLUSIONS** 15

Bodily Injury or Property Damage 15
Deceptive Business Practices, Antitrust & Consumer Protection 15
Distribution of Information 15
Prior Known Acts & Prior Noticed Claims 15
Racketeering, Benefit Plans, Employment Liability & Discrimination 16
Sale or Ownership of Securities & Violation of Securities Laws 16
Criminal, Intentional or Fraudulent Acts 16
Patent & Misappropriation of Information 16
Governmental Actions 17
Other Insureds & Related Enterprises 17
Trading Losses & Loss of Money 17
Contractual 17
Retroactive Date 17
Recall 18
Infrastructure Failure 18
Licensing Bodies & Joint Ventures 18
Over-Redemption 18
First Party Data & Network Loss 18

**LIMIT OF LIABILITY AND COVERAGE** 19

**RETENTIONS** 19

**OPTIONAL EXTENSION PERIOD** 19

**GENERAL CONDITIONS** 20

Notice of Claim or Loss 20
Beazley Breach Response Services 20
Notice of Circumstance 21
Defense of Claims 21
Settlement of Claims 22
Assistance and Cooperation 22
Subrogation 23
Other Insurance 23
Action Against the Underwriters 23
Entire Agreement 23
Mergers or Consolidations 23
Assignment 24
Cancellation 24
Singular Form of a Word 24
Headings 24
Representation by the Insured 24
Named Insured As Agent 24



# Beazley MediaTech

**THIS POLICY'S LIABILITY INSURING AGREEMENTS PROVIDE COVERAGE ON A CLAIMS MADE AND REPORTED BASIS AND APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE OPTIONAL EXTENSION PERIOD (IF APPLICABLE) AND REPORTED TO THE UNDERWRITERS IN ACCORDANCE WITH THE TERMS OF THIS POLICY. AMOUNTS INCURRED AS CLAIMS EXPENSES UNDER THIS POLICY WILL REDUCE AND MAY EXHAUST THE LIMIT OF LIABILITY AND ARE SUBJECT TO RETENTIONS.**

Please refer to the Declarations, which show the insuring agreements that the **Named Insured** purchased. If an insuring agreement has not been purchased, coverage under that insuring agreement of this Policy will not apply.

The Underwriters agree with the **Named Insured**, in consideration of the payment of the premium and reliance upon the statements contained in the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Insurance Policy (hereinafter referred to as the "Policy") and subject to all the provisions, terms and conditions of this Policy:

## INSURING AGREEMENTS

### Media, Tech, Data & Network Liability

To pay **Damages** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of any **Claim** first made against any **Insured** during the **Policy Period** for a:

1.  **Tech & Professional Services Wrongful Act**;

2.  **Tech Product Wrongful Act**;

3.  **Media Wrongful Act**; or

4.  **Data & Network Wrongful Act**.

### Breach Response

To indemnify the **Insured Organization** for **Breach Response Costs** incurred by the **Insured Organization** because of an actual or reasonably suspected **Data Breach** or **Security Breach** that the **Insured** first discovers during the **Policy Period**.

### Regulatory Defense & Penalties

To pay **Penalties** and **Claims Expenses**, which the **Insured** is legally obligated to pay because of a **Regulatory Proceeding** first made against any **Insured** during the **Policy Period** for a **Data Breach** or a **Security Breach**.

### Payment Card Liabilities & Costs

To indemnify the **Insured Organization** for **PCI Fines, Expenses and Costs** which it is legally obligated to pay because of a **Claim** first made against any **Insured** during the **Policy Period**.

### First Party Data & Network Loss

To indemnify the **Insured Organization** for:

*Business Interruption Loss*

**Business Interruption Loss** that the **Insured Organization** sustains as a result of a **Security Breach** or **System Failure** that the **Insured** first discovers during the **Policy Period**.

*Dependent Business Interruption Loss*

**Dependent Business Loss** that the **Insured Organization** sustains as a result of a **Dependent Security Breach** or a **Dependent System Failure** that the **Insured** first discovers during the **Policy Period**.

*Cyber Extortion Loss*

**Cyber Extortion Loss** that the **Insured Organization** incurs as a result of an **Extortion Threat** first made against the **Insured Organization** during the **Policy Period**.

*Data Recovery Costs*

**Data Recovery Costs** that the **Insured Organization** incurs as a direct result of a **Security Breach** or **System Failure** that the **Insured** first discovers during the **Policy Period**.

### eCrime

To indemnify the **Insured Organization** for any direct financial loss sustained resulting from:

1. **Fraudulent Instruction**;
2. **Funds Transfer Fraud**; or
3. **Telephone Fraud**;

that the **Insured** first discovers during the **Policy Period**.

### Criminal Reward

To indemnify the **Insured Organization** for **Criminal Reward Funds**.

## DEFINITIONS

**Additional Insured** means any person or entity that the **Insured Organization** has agreed in writing to add as an **Additional Insured** under this Policy prior to the commission of any act for which such person or entity would be provided coverage under this Policy, but only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**.

**Breach Notice Law** means any statute or regulation that requires notice to persons whose personal information was accessed or reasonably may have been accessed by an unauthorized person. **Breach Notice Law** also includes any statute or regulation requiring notice of a **Data Breach** to be provided to governmental or regulatory authorities.

**Breach Response Costs** means the following fees and costs incurred by the **Insured Organization** with the Underwriters' prior written consent in response to an actual or reasonably suspected **Data Breach** or **Security Breach**:

1.  for an attorney to provide necessary legal advice to the **Insured Organization** to evaluate its obligations pursuant to **Breach Notice Laws** or a **Merchant Services Agreement**;

2.  for a computer security expert to determine the existence, cause and scope of an actual or reasonably suspected **Data Breach**, and if such **Data Breach** is actively in progress on the **Insured Organization's Computer Systems**, to assist in containing it;

3.  for a PCI Forensic Investigator to investigate the existence and extent of an actual or reasonably suspected **Data Breach** involving payment card data and for a Qualified Security Assessor to certify and assist in attesting to the **Insured Organization's** PCI compliance, as required by a **Merchant Services Agreement**;

4.  to notify those individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach**;

5.  to provide a call center to respond to inquiries about a **Data Breach**;

6.  to provide a credit monitoring, identity monitoring or other personal fraud or loss prevention solution, to be approved by the Underwriters, to individuals whose **Personally Identifiable Information** was potentially impacted by a **Data Breach**; and

7.  public relations and crisis management costs directly related to mitigating harm to the **Insured Organization** which are approved in advance by the Underwriters in their discretion.

**Breach Response Costs** will not include any internal salary or overhead expenses of the **Insured Organization**.

**Business Interruption Loss** means:

1.  **Income Loss**;

2.  **Forensic Expenses**; and

3.  **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach** or **System Failure**. Coverage for **Business Interruption Loss** will apply only after the **Waiting Period** has elapsed.

**Business Interruption Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Dependent Business Loss**; or (vi) **Data Recovery Costs**.

**Claim** means:

1. a written demand received by any **Insured** for money, services, or any non-monetary or injunctive relief;

2. a written request for mediation or arbitration received by any **Insured**;

3. a civil proceeding against any **Insured** commenced by service of a complaint or similar proceeding;

4. a written request to toll or waive any applicable statute of limitations;

5. with respect to coverage provided under the Regulatory Defense & Penalties insuring agreement only, institution of a **Regulatory Proceeding** against any **Insured**; and

Multiple **Claims** arising from the same or a series of related, repeated or continuing acts, errors, omissions or events will be considered a single **Claim** for the purposes of this Policy. All such **Claims** will be deemed to have been made at the time of the first such **Claim**.

**Claims Expenses** means:

1. all reasonable and necessary legal costs and expenses resulting from the investigation, defense and appeal of a **Claim**, if incurred by the Underwriters, or by the **Insured** with the prior written consent of the Underwriters; and

2. the premium cost for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation; provided the Underwriters will have no obligation to appeal or to obtain bonds.

**Claims Expenses** will not include any salary, overhead, or other charges by the **Insured** for any time spent in cooperating in the defense and investigation of any **Claim**, or costs to comply with any regulatory orders, settlements or judgments.

**Computer Systems** means computers, any software residing on such computers and any associated devices or equipment (including computers, hardware, software and input and output devices which are part of an industrial control system, including a supervisory control and data acquisition (SCADA) system):

1. operated by and either owned by or leased to the **Insured Organization**; or

2. with respect to coverage under Part 4. of the Media, Tech, Data & Network Liability insuring agreement, as well as the Breach Response, Regulatory Defense & Penalties and Payment Card Liabilities & Costs insuring agreements, operated by a third party pursuant to written contract with the **Insured Organization** and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data.

**Continuity Date** means:

1.   the Continuity Date listed in the Declarations; and

2.   with respect to any **Subsidiaries** acquired after the Continuity Date listed in the Declarations, the date the **Named Insured** acquired such **Subsidiary**.

**Control Group** means any principal, partner, corporate officer, director, general counsel (or most senior legal counsel) or risk manager of the **Insured Organization** and any individual in a substantially similar position.

**Criminal Reward Funds** means any amount offered and paid by the **Insured Organization** with the Underwriters' prior written consent for information that leads to the arrest and conviction of any individual(s) committing or trying to commit any illegal act related to any coverage under this Policy; but will not include any amount based upon information provided by the **Insured**, the **Insured's** auditors or any individual hired or retained to investigate the illegal acts.  All **Criminal Reward Funds** offered pursuant to this Policy must expire no later than 6 months following the end of the **Policy Period**.

**Cyber Extortion Loss** means:

1.   any **Extortion Payment** that has been made by or on behalf of the **Insured Organization** with the Underwriters' prior written consent to prevent or terminate an **Extortion Threat**; and

2.   reasonable and necessary expenses incurred by the **Insured Organization** with the Underwriters' prior written consent to prevent or respond to an **Extortion Threat**.

**Damages** means a monetary judgment, award or settlement, including any award of prejudgment or post-judgment interest. With the prior written consent of the Underwriters, **Damages** also include the direct net cost of providing any future service credits offered by the **Insured Organization** in lieu of a monetary payment.

**Damages** will not include:

1.   future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or equitable relief;

2.   return or offset of fees, charges or commissions charged by or owed to an **Insured** for goods or services already provided or contracted to be provided;

3.   taxes or loss of tax benefits;

4.   fines, sanctions or penalties against any **Insured**;

5.   punitive or exemplary damages or any damages which are a multiple of compensatory damages, unless insurable by law in any applicable venue that most favors coverage for such punitive, exemplary or multiple damages;

6.   discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7. liquidated damages, but only to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such liquidated damages agreement;

8. fines, costs or other amounts an **Insured** is responsible to pay under a **Merchant Services Agreement**; or

9. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured.**

**Data** means any software or electronic data that exists in **Computer Systems** and that is subject to regular back-up procedures.

**Data Breach** means the theft, loss, or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** that is in the care, custody or control of the **Insured Organization** or a third party for whose theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Information** or **Third Party Information** the **Insured Organization** is liable.

**Data & Network Wrongful Act** means:

1. a **Data Breach**;

2. a **Security Breach**;

3. failure to timely disclose a **Data Breach** or **Security Breach**; or

4. a **Privacy Policy Violation**.

**Data Recovery Costs** means the reasonable and necessary costs incurred by the **Insured Organization** to regain access to, replace, or restore **Data**, or if **Data** cannot reasonably be accessed, replaced, or restored, then the reasonable and necessary costs incurred by the **Insured Organization** to reach this determination.

**Data Recovery Costs** will not include: (i) the monetary value of profits, royalties, or lost market share related to **Data**, including but not limited to trade secrets or other proprietary information or any other amount pertaining to the value of **Data**; (ii) legal costs or legal expenses; (iii) loss arising out of any liability to any third party; or (iv) **Cyber Extortion Loss**.

**Dependent Business** means any entity that is not a part of the **Insured Organization** but which provides necessary products or services to the **Insured Organization** pursuant to a written contract.

**Dependent Business Loss** means:

1. **Income Loss**; and

2. **Extra Expense**;

actually sustained during the **Period of Restoration** as a result of an actual interruption of the **Insured Organization's** business operations caused by a **Dependent Security Breach** or **Dependent System Failure**. Coverage for **Dependent Business Loss** will apply only after the **Waiting Period** has elapsed.

**Dependent Business Loss** will not include (i) loss arising out of any liability to any third party; (ii) legal costs or legal expenses; (iii) loss incurred as a result of unfavorable business conditions; (iv) loss of market or any other consequential loss; (v) **Business Interruption Loss**; or (vi) **Data Recovery Costs**.

**Dependent Security Breach** means a failure of computer security to prevent a breach of computer systems operated by a **Dependent Business**.

**Dependent System Failure** means an unintentional and unplanned interruption of computer systems operated by a **Dependent Business.**

**Dependent System Failure** will not include any interruption of computer systems resulting from (i) a **Dependent Security Breach**, or (ii) the interruption of computer systems that are not operated by a **Dependent Business**.

**Digital Currency** means a type of digital currency that:

1. requires cryptographic techniques to regulate the generation of units of currency and verify the transfer thereof;
2. is both stored and transferred electronically; and
3. operates independently of a central bank or other central authority.

**Extortion Payment** means **Money**, **Digital Currency**, marketable goods or services demanded to prevent or terminate an **Extortion Threat**.

**Extortion Threat** means a threat to:

1. alter, destroy, damage, delete or corrupt **Data**;
2. perpetrate the **Unauthorized Access or Use** of **Computer Systems**;
3. prevent access to **Computer Systems** or **Data**;
4. steal, misuse or publicly disclose **Data**, **Personally Identifiable Information** or **Third Party Information**;
5. introduce malicious code into **Computer Systems** or to third party computer systems from **Computer Systems**; or
6. interrupt or suspend **Computer Systems**;

unless an **Extortion Payment** is received from or on behalf of the **Insured Organization**.

**Extra Expense** means reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure** occurred.

**Financial Institution** means a bank, credit union, saving and loan association, trust company or other licensed financial service, securities broker-dealer, mutual fund, or liquid assets fund or similar investment company where the **Insured Organization** maintains a bank account.

**Forensic Expenses** means reasonable and necessary expenses incurred by the **Insured Organization** to investigate the source or cause of a **Business Interruption Loss**.

**Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a result of fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions provided by a third party, that is intended to mislead an **Insured** through the misrepresentation of a material fact which is relied upon in good faith by such **Insured**.

**Fraudulent Instruction** will not include loss arising out of:

1. fraudulent instructions received by the **Insured** which are not first authenticated via a method other than the original means of request to verify the authenticity or validity of the request;

2. any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;

3. any transfer involving a third party who is not a natural person **Insured**, but had authorized access to the **Insured's** authentication mechanism;

4. the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;

5. accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;

6. any liability to any third party, or any indirect or consequential loss of any kind;

7. any legal costs or legal expenses; or

8. proving or establishing the existence of **Fraudulent Instruction**.

**Funds Transfer Fraud** means the loss of **Money** or **Securities** contained in a **Transfer Account** at a **Financial Institution** resulting from fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions by a third party issued to a **Financial Institution** directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by the **Insured Organization** at such institution, without the **Insured Organization's** knowledge or consent.

**Funds Transfer Fraud** will not include any loss arising out of:

1. the type or kind covered by the **Insured Organization's** financial institution bond or commercial crime policy;

2. any actual or alleged fraudulent, dishonest or criminal act or omission by, or involving, any natural person **Insured**;

3. any indirect or consequential loss of any kind;

4. punitive, exemplary or multiplied damages of any kind or any fines, penalties or loss of any tax benefit;

5. any liability to any third party, except for direct compensatory damages arising directly from **Funds Transfer Fraud**;

6.	any legal costs or legal expenses; or proving or establishing the existence of **Funds Transfer Fraud**;

7.	the theft, disappearance, destruction of, unauthorized access to, or unauthorized use of confidential information, including a PIN or security code;

8.	any forged, altered or fraudulent negotiable instruments, securities, documents or instructions; or

9.	any actual or alleged use of credit, debit, charge, access, convenience or other cards or the information contained on such cards.

**Income Loss** means an amount equal to:

1.	net profit or loss before interest and tax that the **Insured Organization** would have earned or incurred; and

2.	continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Period of Restoration**.

**Individual Contractor** means any natural person who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement with the **Insured Organization**.  The status of an individual as an **Individual Contractor** will be determined as of the date of an alleged act, error or omission by any such **Individual Contractor**.

**Insured** means:

1.	the **Insured Organization**;

2.	any director or officer of the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

3.	an employee (including a part time, temporary, leased or seasonal employee or volunteer) or **Individual Contractor** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business;

4.	a principal if the **Named Insured** is a sole proprietorship, or a partner if the **Named Insured** is a partnership, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

5.	any person who previously qualified as an **Insured** under parts 2. through 4., but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

6.	an **Additional Insured**, but only as respects **Claims** against such person or entity for acts, errors or omissions of the **Insured Organization**;

7.	the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy; and

8.     the lawful spouse, including any natural person qualifying as a domestic partner of any **Insured**, but solely by reason of any act, error or omission of an **Insured** other than such spouse or domestic partner.

**Insured Organization** means the **Named Insured** and any **Subsidiaries**.

**Loss** means **Breach Response Costs**, **Business Interruption Loss**, **Claims Expenses**, **Criminal Reward Funds**, **Cyber Extortion Loss**, **Damages**, **Data Recovery Costs**, **Dependent Business Loss**, **PCI Fines, Expenses and Costs**, **Penalties**, loss covered under the eCrime insuring agreement and any other amounts covered under this Policy.

Any **Loss** arising from the same or a series of related, repeated or continuing acts, errors, omissions, incidents or events will be considered a single **Loss** for the purposes of this Policy.

With respect to the Breach Response and First Party Data & Network Loss insuring agreements, all acts, errors, omissions, incidents or events (or series of related, repeated or continuing acts, errors, omissions, incidents or events) giving rise to **Loss** in connection with such insuring agreements will be deemed to have been discovered at the time the first such act, error, omission, incident or event is discovered.

**Media Activities** means creating, displaying, broadcasting, disseminating or releasing **Media Material** by or on behalf of the **Insured Organization** to the public, including any blog, webcasts, websites, broadcast or cable stations, or social media web pages, created and maintained by or on behalf of the **Insured Organization**.

**Media Material** means any information, including words, sounds, numbers, images or graphics, but will not include computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

**Media Wrongful Act** means one or more of the following acts committed on or after the **Retroactive Date** and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Media Activities**, **Professional Services** or **Tech Services**:

1.     defamation, libel, slander, product disparagement, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.     a violation of the rights of privacy of an individual, including false light, intrusion upon seclusion and public disclosure of private facts;

3.     invasion or interference with an individual's right of publicity, including misappropriation of any name, persona, voice or likeness for commercial advantage;

4.     false arrest, detention or imprisonment;

5.     invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;

6.     plagiarism, piracy or misappropriation of ideas under implied contract;

7.     infringement of copyright;

8.      infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark, or improper deep-linking or framing or infringement of domain name including cybersquatting violations;

9.      negligence regarding the content of any **Media Activities**, including harm caused through any reliance or failure to rely upon such content;

10.     misappropriation of a trade secret;

11.     unfair competition including a violation of Section 43(a) of the Lanham Act, but only if alleged in conjunction with and arising out of any of the acts listed in paragraphs 7. or 8. above.

**Merchant Services Agreement** means any agreement between an **Insured** and a financial institution, credit/debit card company, credit/debit card processor or independent service operator enabling an **Insured** to accept credit card, debit card, prepaid card or other payment cards for payments or donations.

**Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

**Named Insured** means the Named Insured listed in the Declarations.

**PCI Fines, Expenses and Costs** means the monetary amount owed by the **Insured Organization** under the terms of a **Merchant Services Agreement** as a direct result of a suspected **Data Breach**.  With the prior consent of the Underwriters, **PCI Fines, Expenses and Costs** includes reasonable and necessary legal costs and expenses incurred by the **Insured Organization** to appeal or negotiate an assessment of such monetary amount.  **PCI Fines, Expenses and Costs** will not include any charge backs, interchange fees, discount fees or other fees unrelated to a **Data Breach**.

**Penalties** means:

1.      any monetary civil fine or penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding**; and

2.      amounts which the **Insured** is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund");

but will not include: (i) costs to remediate or improve **Computer Systems**; (ii) costs to establish, implement, maintain, improve or remediate security or privacy practices, procedures, programs or policies; (iii) audit, assessment, compliance or reporting costs; or (iv) costs to protect the confidentiality, integrity and/or security of **Personally Identifiable Information** or other information.

The insurability of **Penalties** will be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**.

**Period of Restoration** means the 180-day period of time that begins upon the actual and necessary interruption of the **Insured Organization's** business operations.

**Personally Identifiable Information** means:

1. any information concerning an individual that is defined as personal information under any **Breach Notice Law**; and

2. an individual's drivers license or state identification number, social security number, unpublished telephone number, and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or PINs; if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information.

but will not include information that is lawfully made available to the general public.

**Policy Period** means the period of time between the inception date listed in the Declarations and the effective date of termination, expiration or cancellation of this Policy and specifically excludes any Optional Extension Period or any prior policy period or renewal period.

**Privacy Policy** means the **Insured Organization's** public declaration of its policy for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to **Personally Identifiable Information**.

**Privacy Policy Violation** means the failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

1. prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of **Personally Identifiable Information**;

2. requires the **Insured Organization** to provide an individual access to **Personally Identifiable Information** or to correct incomplete or inaccurate **Personally Identifiable Information** after a request is made;

3. mandates procedures and requirements to prevent the loss of **Personally Identifiable Information**;

4. prevents or prohibits improper, intrusive or wrongful collection of **Personally Identifiable Information** from another person;

5. requires notice to a person of the **Insured Organization's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Information**; or

6. provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Insured Organization's** collection or use of his or her **Personally Identifiable Information**;

provided the **Insured Organization** has in force, at the time of such failure, a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**.

**Professional Services** means professional services performed for others by or on behalf of the **Insured Organization** for a fee.

**Professional Services** will not include activities performed by or on behalf of the **Insured Organization** as an accountant, architect, surveyor, health care provider, lawyer, insurance or real estate agent or broker, or civil or structural engineer.

**Regulatory Proceeding** means a request for information, civil investigative demand, or civil proceeding brought by or on behalf of any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

**Retroactive Date** means the applicable date listed in the Declarations.

**Securities** means negotiable and non-negotiable instruments or contracts representing either **Money** or tangible property that has intrinsic value.

**Security Breach** means a failure of computer security to prevent:

    1.    **Unauthorized Access or Use** of **Computer Systems**, including **Unauthorized Access or Use** resulting from the theft of a password from a **Computer System** or from any **Insured**;

    2.    a denial of service attack affecting **Computer Systems**;

    3.    with respect to coverage under the Liability insuring agreements, a denial of service attack affecting computer systems that are not owned, operated or controlled by an **Insured**; or

    4.    infection of **Computer Systems** by malicious code or transmission of malicious code from **Computer Systems**.

**Subsidiary** means any entity:

    1.    which, on or prior to the inception date of this Policy, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding voting securities ("Management Control"); and

    2.    which the **Named Insured** acquires Management Control after the inception date of this Policy; provided that:

        (i)    the revenues of such entity do not exceed 15% of the **Named Insured's** annual revenues; or

        (ii)    if the revenues of such entity exceed 15% of the **Named Insured's** annual revenues, then coverage under this Policy will be afforded for a period of 60 days, but only for any **Claim** that arises out of any act, error, omission, incident or event first occurring after the entity becomes so owned.  Coverage beyond such 60 day period will only be available if the **Named Insured** gives the Underwriters written notice of the acquisition, obtains the written consent of Underwriters to extend coverage to the entity beyond such 60 day period and agrees to pay any additional premium required by Underwriters.

This Policy provides coverage only for acts, errors, omissions, incidents or events that occur while the **Named Insured** has Management Control over an entity.

**System Failure** means an unintentional and unplanned interruption of **Computer Systems**.

    **System Failure** will not include any interruption of computer systems resulting from (i) a **Security Breach**, or (ii) the interruption of any third party computer system.

**Tech Products** means a computer or telecommunications hardware or software product, or related electronic product, that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others, for compensation, including software updates, service packs and other maintenance releases provided for such products.

**Tech & Professional Services Wrongful Act** means any negligent act, error, omission, misstatement, misleading statement, misrepresentation or unintentional breach of a contractual obligation by the **Insured**, or by any person or entity for whom the **Insured** is legally liable, in rendering or failing to render **Professional Services** or **Tech Services** that occurs on or after the **Retroactive Date** and before the end of the **Policy Period**, but does not mean a **Media Wrongful Act**.

**Tech Product Wrongful Act** means:

1.   any negligent act, error, omission, misstatement, misleading statement, misrepresentation or unintentional breach of a contractual obligation by the **Insured** that results in the failure of **Tech Products** to perform the function or serve the purpose intended; or

2.   software copyright infringement by the **Insured** with respect to **Tech Products**;

that occurs on or after the **Retroactive Date** and before the end of the **Policy Period**.

**Tech Services** means computer, cloud computing, and electronic technology services, including:

1.   data processing, software as a service (SaaS), platform as a service (PaaS), infrastructure as a service (IaaS), network as a service (NaaS);

2.   data and application hosting, computer systems analysis, and technology consulting and training; or

3.   custom software programming for a specific client of the **Insured Organization** and, computer and software systems installation and integration;

performed by the **Insured**, or by others acting under the **Insured Organization's** trade name, for others for a fee.

**Telephone Fraud** means the act of a third party gaining access to and using the **Insured Organization's** telephone system in an unauthorized manner.

**Third Party Information** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public.

**Transfer Account** means an account maintained by the **Insured Organization** at a **Financial Institution** from which the **Insured Organization** can initiate the transfer, payment or delivery of **Money** or **Securities**.

**Unauthorized Access or Use** means the gaining of access to or use of **Computer Systems** by an unauthorized person(s) or the use of **Computer Systems** in an unauthorized manner.

**Unauthorized Disclosure** means the disclosure of (including disclosure resulting from phishing) or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent or acquiescence of any member of the **Control Group**.

**Waiting Period** means the period of time that begins upon the actual interruption of the **Insured Organization's** business operations caused by a **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure**, and ends after the elapse of the number of hours listed as the **Waiting Period** in the Declarations.

## EXCLUSIONS

The coverage under this Policy will not apply to any **Loss** arising out of:

### Bodily Injury or Property Damage

    1.    physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting from such physical injury, sickness, disease or death; or

    2.    physical injury to or destruction of any tangible property, including the loss of use thereof; but electronic data will not be considered tangible property;

### Deceptive Business Practices, Antitrust & Consumer Protection

    any actual or alleged false, deceptive or unfair trade practices, antitrust violation, restraint of trade, unfair competition (except as provided under part 3. of the Media, Tech, Data & Network Liability insuring agreement), violation of consumer protection law, false, deceptive or misleading advertising, inaccurate cost estimates or failure of goods or services to conform with any represented quality or performance, or violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act; but this exclusion will not apply to:

    1.    the Breach Response insuring agreement; or

    2.    coverage for a **Data Breach** or **Security Breach**, provided no member of the **Control Group** participated or colluded in such **Data Breach** or **Security Breach**;

### Distribution of Information

    the distribution of unsolicited email, text messages, direct mail, facsimiles or other communications, wire tapping, audio or video recording, or telemarketing, if such distribution, wire tapping, recording or telemarketing is done by or on behalf of the **Insured Organization**; but this exclusion will not apply to **Claims Expenses** incurred in defending the **Insured** against allegations of unlawful audio or video recording;

### Prior Known Acts & Prior Noticed Claims

    1.    any act, error, omission, incident or event committed or occurring prior to the inception date of this Policy if any member of the **Control Group** on or before the **Continuity Date** knew or could have reasonably foreseen that such act, error or omission, incident or event might be expected to be the basis of a **Claim** or **Loss**;

    2.    any **Claim**, **Loss**, incident or circumstance for which notice has been provided under any prior policy of which this Policy is a renewal or replacement;

### Racketeering, Benefit Plans, Employment Liability & Discrimination

1.   any actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced and Corrupt Organizations Act or RICO), as amended;

2.   any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts;

3.   any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees; or

4.   any actual or alleged discrimination;

but this exclusion will not apply to coverage under the Breach Response insuring agreement or coverage for a **Data Breach** or **Security Breach**, provided no member of the **Control Group** participated or colluded in such **Data Breach** or **Security Breach**;

### Sale or Ownership of Securities & Violation of Securities Laws

1.   the ownership, sale or purchase of, or the offer to sell or purchase stock or other securities; or

2.   an actual or alleged violation of a securities law or regulation;

### Criminal, Intentional or Fraudulent Acts

any criminal, dishonest, fraudulent, or malicious act or omission, or intentional or knowing violation of the law, if committed by an **Insured**, or by others if the **Insured** colluded or participated in any such conduct or activity; but this exclusion will not apply to:

1.   **Claims Expenses** incurred in defending any **Claim** alleging the foregoing until there is a final non-appealable adjudication establishing such conduct; or

2.   with respect to a natural person **Insured**, if such **Insured** did not personally commit, participate in or know about any act, error, omission, incident or event giving rise to such **Claim** or **Loss**.

For purposes of this exclusion, only acts, errors, omissions or knowledge of a member of the **Control Group** will be imputed to the **Insured Organization**;

### Patent & Misappropriation of Information

1.   infringement, misuse or abuse of patent or patent rights;

2.   misappropriation of trade secret arising out of or related to **Tech Products** or any other products;

3.   with respect to any **Data & Network Wrongful Act**, misappropriation of any **Third Party Information** (i) by or on behalf of the **Insured Organization**, or (ii) by any other person or entity if such misappropriation is done with the knowledge, consent or acquiescence of a member of the **Control Group**; or

4. disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person or entity prior to the date he or she became an **Insured** or **Subsidiary** of the **Insured Organization**;

### Governmental Actions

a **Claim** brought by or on behalf of any state, federal, local or foreign governmental entity, in such entity's regulatory or official capacity; but this exclusion will not apply to the Regulatory Defense & Penalties insuring agreement, or any **Claim** made against the **Insured Organization** by a governmental entity solely in its capacity as a customer of the **Insured Organization**;

### Other Insureds & Related Enterprises

a **Claim** made by or on behalf of:

1. any **Insured**; but this exclusion will not apply to a **Claim** made by an individual that is not a member of the **Control Group** for a **Data & Network Wrongful Act**, or a **Claim** made by an **Additional Insured**; or

2. any business enterprise in which any **Insured** has greater than 15% ownership interest or made by any parent company or other entity which owns more than 15% of the **Named Insured**;

### Trading Losses & Loss of Money

1. any trading losses, trading liabilities or change in value of accounts;

2. any loss, transfer or theft of monies, securities or tangible property of the **Insured** or others in the care, custody or control of the **Insured Organization**; or

3. the monetary value of any transactions or electronic fund transfers by or on behalf of the **Insured** which is lost, diminished, or damaged during transfer from, into or between accounts;

but this exclusion will not apply to coverage under the eCrime insuring agreement;

### Contractual

with respect to coverage under parts 1. and 3. of the Media, Tech, Data & Network Liability insuring agreement:

any obligation the **Insured** has under contract; but this exclusion will not apply to:

1. the obligation to perform **Professional Services** or **Tech Services**;

2. a **Claim** for misappropriation of ideas under implied contract, or

3. to the extent the **Insured** would have been liable in the absence of such contract;

### Retroactive Date

any related or continuing act, error, omission, misstatement, misleading statement, misrepresentation, unintentional breach of a contractual obligation, incident or event where the first such act, error, omission, misstatement, misleading statement,

misrepresentation or unintentional breach of a contractual obligation, incident or event was committed or occurred prior to the **Retroactive Date**;

### Recall

any costs or expenses incurred or to be incurred by the **Insured** or others for the reprinting, reposting, recall, inspection, repair, replacement, removal or disposal of any **Tech Products**, **Media Material** or work product, including when resulting from or incorporating the results of **Professional Services** or **Tech Services**; but this exclusion will not apply to the resulting loss of use of such **Tech Products**, **Media Material** or work product resulting from or incorporating the results of **Professional Services** or **Tech Services**;

### Infrastructure Failure

failure or malfunction of satellites or of power, utility, mechanical or telecommunications (including internet) infrastructure or services that are not under the **Insured Organization's** direct operational control;

### Licensing Bodies & Joint Ventures

1.      the actual or alleged obligation to make licensing fee or royalty payments; or any **Claim** brought by or on behalf of any intellectual property licensing bodies or organizations;

2.      any **Claim** made by or on behalf of any independent contractor, joint venturer or venture partner arising out of or resulting from disputes over ownership of rights in **Media Material** or services provided by such independent contractor, joint venturer or venture partner;

### Over-Redemption

1.      any actual or alleged gambling, contest, lottery, promotional game or other game of chance; or

2.      the value of coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

### First Party Data & Network Loss

with respect to the First Party Data & Network Loss insuring agreements:

1.      seizure, nationalization, confiscation, or destruction of property or data by order of any governmental or public authority;

2.      costs or expenses incurred by the **Insured** to identify or remediate software program errors or vulnerabilities or update, replace, restore, assemble, reproduce, recollect or enhance data or **Computer Systems** to a level beyond that which existed prior to a **Security Breach**, **System Failure**, **Dependent Security Breach**, **Dependent System Failure** or **Extortion Threat**;

3.      fire, flood, earthquake, volcanic eruption, explosion, lightning, wind, hail, tidal wave, landslide, act of God or other physical event.

## LIMIT OF LIABILITY AND COVERAGE

The Policy Aggregate Limit of Liability listed in the Declarations (the "**Policy Aggregate Limit of Liability**") is the Underwriters' combined total limit of liability for all **Loss** payable under this Policy.

The limit of liability payable under each insuring agreement will be an amount equal to the **Policy Aggregate Limit of Liability** unless another amount is listed in the Declarations.  Such amount is the aggregate amount payable under this Policy pursuant to such insuring agreement and is part of, and not in addition to, the **Policy Aggregate Limit of Liability**.

All **Dependent Business Loss** payable under this Policy is part of and not in addition to the **Business Interruption Loss** limit listed in the Declarations.

The Underwriters will not be obligated to pay any **Loss,** or to defend any **Claim**, after the **Policy Aggregate Limit of Liability** has been exhausted, or after deposit of the **Policy Aggregate Limit of Liability** in a court of competent jurisdiction.

## RETENTIONS

The Retention listed in the Declarations applies separately to each act, error, omission, incident, event or related acts, errors, omissions, incidents or events giving rise to a **Claim** or **Loss**. The Retention will be satisfied by monetary payments by the **Named Insured** of covered **Loss** under each insuring agreement. If any **Loss** arising out of an incident or **Claim** is subject to more than one Retention, the Retention for each applicable insuring agreement will apply to such **Loss**, provided that the sum of such Retention amounts will not exceed the largest applicable Retention amount.

Coverage for **Business Interruption Loss** and **Dependent Business Loss** will apply after the **Waiting Period** has elapsed and the Underwriters will then indemnify the **Named Insured** for all **Business Interruption Loss** and **Dependent Business Loss** sustained during the **Period of Restoration** in excess of the Retention.

Satisfaction of the applicable Retention is a condition precedent to the payment of any **Loss** under this Policy, and the Underwriters will be liable only for the amounts in excess of such Retention.

## OPTIONAL EXTENSION PERIOD

Upon non-renewal or cancellation of this Policy for any reason except the non-payment of premium, the **Named Insured** will have the right to purchase, for additional premium in the amount of the Optional Extension Premium percentage listed in the Declarations of the full Policy Premium listed in the Declarations, an Optional Extension Period for the period of time listed in the Declarations. Coverage provided by such Optional Extension Period will only apply to **Claims** first made against any **Insured** during the Optional Extension Period and reported to the Underwriters during the Optional Extension Period, and arising out of any act, error or omission committed on or after the **Retroactive Date** (if applicable) and before the end of the **Policy Period**. In order for the **Named Insured** to invoke the Optional Extension Period option, the payment of the additional premium for the Optional Extension Period must be paid to the Underwriters within 60 days of the termination of this Policy.

The purchase of the Optional Extension Period will in no way increase the **Policy Aggregate Limit of Liability** or any sublimit of liability. At the commencement of the Optional Extension Period the entire premium will be deemed earned, and in the event the **Named Insured** terminates the

Optional Extension Period for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the Optional Extension Period.

All notices and premium payments with respect to the Optional Extension Period option will be directed to the Underwriters through entity listed for Administrative Notice in the Declarations.

## GENERAL CONDITIONS

### Notice of Claim or Loss

The **Insured** must notify the Underwriters of any **Claim** as soon as practicable, but in no event later than: (i) 60 days after the end of the **Policy Period**; or (ii) the end of the Optional Extension Period (if applicable).  Notice must be provided through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations.

With respect to **Breach Response Costs**, the **Insured** must notify the Underwriters of any actual or reasonably suspected **Data Breach** or **Security Breach** as soon as practicable after discovery by the **Insured**, but in no event later than 60 days after the end of the **Policy Period**. Notice must be provided through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations. Notice of an actual or reasonably suspected **Data Breach** or **Security Breach** in conformance with this paragraph will also constitute notice of a circumstance that could reasonably be the basis for a **Claim**.

With respect to **Cyber Extortion Loss**, the **Named Insured** must notify the Underwriters via the email address listed in the Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable after discovery of an **Extortion Threat** but no later than 60 days after the end of the **Policy Period**.  The **Named Insured** must obtain the Underwriters' consent prior to incurring **Cyber Extortion Loss**.

With respect to **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss** the **Named Insured** must notify the Underwriters through the contacts for Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss.  The **Named Insured** will provide the Underwriters a proof of **Data Recovery Costs**, **Business Interruption Loss** and **Dependent Business Loss**, and this Policy will cover the reasonable and necessary costs, not to exceed USD 50,000, that the **Named Insured** incurs to contract with a third party to prepare such proof. All loss described in this paragraph must be reported, and all proofs of loss must be provided, to the Underwriters no later than 6 months after the end of the **Policy Period**.

The **Named Insured** must notify the Underwriters of any loss covered under the eCrime insuring agreement as soon as practicable, but in no event later than 60 days after the end of the **Policy Period**. Notice must be provided through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations.

Any **Claim** arising out of a **Loss** that is covered under the Breach Response, First Party Data & Network Loss or eCrime insuring agreements and that is reported to the Underwriters in conformance with the foregoing will be considered to have been made during the **Policy Period**.

### Beazley Breach Response Services

The Underwriters' dedicated business unit focused exclusively on helping **Insureds** successfully prepare for and respond to actual or suspected **Data Breaches** and **Security Breaches** (the "Beazley Breach Response Services Team") will be available to

assist the **Named Insured** in responding to an actual or suspected **Data Breach** or **Security Breach**. The Beazley Breach Response Services Team will work in collaboration with the **Named Insured** to triage and assess the severity of a data breach incident, while assisting the coordination of the range of resources and services the **Named Insured** may need to meet legal requirements and maintain customer confidence. The Beazley Breach Response Services Team may be reached via email at: *bbr.claims@beazley.com* or via a toll-free 24-Hour Hotline: (866) 567-8570.

The **Named Insured** will have access, via the Beazley Breach Response Services Team, to the Underwriters' network of third party breach response service providers, products and services to respond to an actual or suspected **Data Breach** or **Security Breach**. Coverage for the costs of products and services provided by any breach response service provider is subject to the terms and conditions of this Policy.

The **Named Insured** will also have access to educational and loss control information and services made available by the Underwriters from time to time and includes access to beazleybreachsolutions.com, a dedicated portal through which it can access news and information regarding breach response planning, data and network security threats, best practices in protecting data and networks, offers from third party service providers, and related information, tools and services. The **Named Insured** will also have access to communications addressing timely topics in data security, loss prevention and other areas.

Notwithstanding the foregoing, an actual or suspected **Data Breach** or **Security Breach** must be reported to the Underwriters in accordance with the Notice of Claim or Loss clause in order for such incident to be eligible for coverage under the Breach Response insuring agreement. Assistance from and access to the Beazley Breach Response Services Team will terminate after the **Policy Aggregate Limit of Liability** has been exhausted, or after deposit of the **Policy Aggregate Limit of Liability** in a court of competent jurisdiction.

## Notice of Circumstance

With respect to any circumstance that could reasonably be the basis for a **Claim**, the **Insured** may give written notice of such circumstance to the Underwriters through the contacts listed for Notice of Claim, Loss or Circumstance in the Declarations as soon as practicable during the **Policy Period**. Such notice must include:

1. the specific details of the act, error, omission or event that could reasonably be the basis for a **Claim**;

2. the injury or damage which may result or has resulted from the circumstance; and

3. the facts by which the **Insured** first became aware of the act, error, omission or event.

Any subsequent **Claim** made against the **Insured** arising out of any circumstance reported to Underwriters in conformance with the foregoing will be considered to have been made at the time written notice complying with the above requirements was first given to the Underwriters during the **Policy Period**.

## Defense of Claims

Except with respect to coverage under the Payment Card Liabilities & Costs insuring agreement, the Underwriters have the right and duty to defend any covered **Claim** or

**Regulatory Proceeding**. Defense counsel will be mutually agreed by the **Named Insured** and the Underwriters but, in the absence of such agreement, the Underwriters' decision will be final.

With respect to the Payment Card Liabilities & Costs insuring agreement, coverage will be provided on an indemnity basis and legal counsel will be mutually agreed by the **Named Insured** and the Underwriters.

The Underwriters will pay actual loss of salary and reasonable expenses resulting from the attendance by a corporate officer of the **Insured Organization** at any mediation meetings, arbitration proceedings, hearings, depositions, or trials relating to the defense of any **Claim**, subject to a maximum of USD 2,000 per day and USD 100,000 in the aggregate, which amounts will be part of and not in addition to the **Policy Aggregate Limit of Liability**.

## Settlement of Claims

If the **Insured** refuses to consent to any settlement recommended by the Underwriters and acceptable to the claimant, the Underwriters' liability for such **Claim** will not exceed:

1. the amount for which the **Claim** could have been settled, less the remaining Retention, plus the **Claims Expenses** incurred up to the time of such refusal; plus

2. sixty percent (60%) of any **Claims Expenses** incurred after the date such settlement or compromise was recommended to the **Insured** plus sixty percent (60%) of any **Damages**, **Penalties** and **PCI Fines**, **Expenses and Costs** above the amount for which the **Claim** could have been settled;

and the Underwriters will have the right to withdraw from the further defense of such **Claim**.

The **Insured** may settle any **Claim** where the **Damages**, **Penalties**, **PCI Fines**, **Expenses and Costs** and **Claims Expenses** do not exceed 50% of the Retention, provided that the entire **Claim** is resolved and the **Insured** obtains a full release on behalf of all **Insureds** from all claimants.

## Assistance and Cooperation

The Underwriters will have the right to make any investigation they deem necessary, and the **Insured** will cooperate with the Underwriters in all investigations, including investigations regarding coverage under this Policy and the information and materials provided to the underwriters in connection with the underwriting and issuance of this Policy. The **Insured** will execute or cause to be executed all papers and render all assistance as is requested by the Underwriters. The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under this Policy. Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters do not constitute **Claims Expenses** under the Policy.

The **Insured** will not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgment or award or dispose of any **Claim** without the written consent of the Underwriters, except as specifically provided in the Settlement of Claims clause above. Compliance with a **Breach Notice Law** will not be considered an admission of liability.

## Subrogation

If any payment is made under this Policy and there is available to the Underwriters any of the **Insured's** rights of recovery against any other party, then the Underwriters will maintain all such rights of recovery. The **Insured** will do whatever is reasonably necessary to secure such rights and will not do anything after an incident or event giving rise to a **Claim** or **Loss** to prejudice such rights. If the **Insured** has waived its right to subrogate against a third party through written agreement made before an incident or event giving rise to a **Claim** or **Loss** has occurred, then the Underwriters waive their rights to subrogation against such third party. Any recoveries will be applied first to subrogation expenses, second to **Loss** paid by the Underwriters, and lastly to the Retention. Any additional amounts recovered will be paid to the **Named Insured**.

## Other Insurance

The insurance under this Policy will apply in excess of any other valid and collectible insurance available to any **Insured** unless such other insurance is written only as specific excess insurance over this Policy. Provided, however, this Policy will become primary and non-contributory insurance as respects any insurance maintained by an **Additional Insured** if primary insurance is required by a contract in place between the **Additional Insured** and the **Insured Organization**, but only with respect to any **Claim** arising solely from the Media, Tech, Data & Network Liability insuring agreements.

## Action Against the Underwriters

No action will lie against the Underwriters or the Underwriters' representatives unless and until, as a condition precedent thereto, the **Insured** has fully complied with all provisions, terms and conditions of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment or award against the **Insured** after trial, regulatory proceeding, arbitration or by written agreement of the **Insured**, the claimant, and the Underwriters.

No person or organization will have the right under this Policy to join the Underwriters as a party to an action or other proceeding against the **Insured** to determine the **Insured's** liability, nor will the Underwriters be impleaded by the **Insured** or the **Insured's** legal representative.

The **Insured's** bankruptcy or insolvency of the **Insured's** estate will not relieve the Underwriters of their obligations hereunder.

## Entire Agreement

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between the Underwriters and the **Insured** relating to this Policy. Notice to any agent, or knowledge possessed by any agent or by any other person, will not effect a waiver or a change in any part of this Policy or stop the Underwriters from asserting any right under the terms of this Policy; nor will the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy signed by the Underwriters.

## Mergers or Consolidations

If during the **Policy Period** the **Named Insured** consolidates or merges with or is acquired by another entity, or sells more than 50% of its assets to another entity, then this Policy will continue to remain in effect through the end of the **Policy Period**, but only with respect to events, acts or incidents that occur prior to such consolidation, merger or acquisition. There will be no coverage provided by this Policy for any other **Claim** or

**Loss** unless the **Named Insured** provides written notice to the Underwriters prior to such consolidation, merger or acquisition, the **Named Insured** has agreed to any additional premium and terms of coverage required by the Underwriters and the Underwriters have issued an endorsement extending coverage under this Policy.

### Assignment

The interest hereunder of any **Insured** is not assignable. If the **Insured** dies or is adjudged incompetent, such insurance will cover the **Insured's** legal representative as if such representative were the **Insured**, in accordance with the terms and conditions of this Policy.

### Cancellation

This Policy may be cancelled by the **Named Insured** by giving written notice to the Underwriters through the entity listed for Administrative Notice in the Declarations stating when the cancellation will be effective.

This Policy may be cancelled by the Underwriters by mailing to the **Named Insured** at the address listed in the Declarations written notice stating when such cancellation will be effective.   Such date of cancellation will not be less than 60 days (or 10 days for cancellation due to non-payment of premium) after the date of notice.

If this Policy is canceled in accordance with the paragraphs above, the earned premium will be computed pro rata; but the premium will be deemed fully earned if any **Claim**, or any circumstance that could reasonably be the basis for a **Claim** or **Loss**, is reported to the Underwriters on or before the date of cancellation.   Payment or tender of unearned premium is not a condition of cancellation.

### Singular Form of a Word

Whenever the singular form of a word is used herein, the same will include the plural when required by context.

### Headings

The titles of paragraphs, clauses, provisions or endorsements of or to this Policy are intended solely for convenience and reference, and are not deemed in any way to limit or expand the provisions to which they relate and are not part of the Policy.

### Representation by the Insured

All **Insureds** agree that the statements contained the information and materials provided to the Underwriters in connection with the underwriting and issuance of this Policy are true, accurate and are not misleading, and that the Underwriters issued this Policy, and assume the risks hereunder, in reliance upon the truth thereof.

### Named Insured as Agent

The **Named Insured** will be considered the agent of all **Insureds**, and will act on behalf of all **Insureds** with respect to the giving of or receipt of all notices pertaining to this Policy, and the acceptance of any endorsements to this Policy.  The **Named Insured** is responsible for the payment of all premiums and Retentions and for receiving any return premiums.

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## ASBESTOS, POLLUTION, AND CONTAMINATION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the coverage under this Policy will not apply to any **Loss** arising out of either in whole or in part, directly or indirectly arising out of or resulting from or in consequence of, or in any way involving:

1. asbestos, or any materials containing asbestos in whatever form or quantity;

2. the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

   The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3. the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

4. the actual, alleged or threatened discharge, dispersal, release or escape of Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste. Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## CALIFORNIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

1. The definition of **Damages** 5. is amended by the addition of the following:

   In applying the foregoing, punitive damages are not insurable in California.

2. **GENERAL CONDITIONS**, **Cancellation** is deleted in its entirety and replaced with the following:

   **Cancellation/Nonrenewal**

   The **Named Insured** may cancel this Policy by surrender thereof to the Underwriters, or by mailing to the Underwriters written notice stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice shall be equivalent to mailing.

   If this Policy has been in effect for sixty (60) days or less and is not a renewal Policy, the Underwriters may cancel this Policy for any reason.

   If this Policy has been in effect for more than sixty (60) days or is a renewal Policy, the Underwriters may only cancel the Policy for any of the following reasons:

   1. nonpayment of premium;
   2. a judgment by a court or an administrative tribunal that the **Named Insured** has violated any law of this State or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against;
   3. discovery of fraud or material misrepresentation by either of the following: (a) the **Insured** or his or her representative in obtaining the insurance or (b) the **Named Insured** or his or her representative in pursuing a **Claim** under the policy;
   4. discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the **Named Insured** or his or her representative, which materially increase any of the risks insured against;
   5. failure by the **Named Insured** or his or her representative to implement reasonable loss control requirements which were agreed to by the **Insured** as a condition of Policy issuance or which were conditions precedent to the use by the Underwriters of a particular rate or rating plan, if the failure materially increases any of the risks insured against;
   6. a determination by the Commissioner that the loss of, or changes in, an Underwriters' reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Underwriters;
   7. a determination by the Commissioner that a continuation of the Policy coverage would place the Underwriters in violation of the laws of this State or the state of its domicile or that the continuation of coverage would threaten the solvency of the Underwriters; or
   8. a change by the **Named Insured** or his or her representative in the activities or property of the commercial or industrial enterprise which results in a material added

risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the Policy.

If the Underwriters cancel this Policy for any of the reasons set forth in 1. or 3. above, the Underwriters shall mail or deliver written notice of cancellation to the **Named Insured** at the mailing address shown on the Policy at least ten (10) days before the effective date of cancellation. If the Underwriters cancel this Policy for any of the reasons set forth in 2., 4., 5., 6., 7., or 8. above, the Underwriters shall mail or deliver written notice of cancellation to the **Named Insured** at the mailing address shown on the Policy at least thirty (30) days before the effective date of cancellation. Notice of cancellation shall also be sent to the producer of record, if applicable, provided that the producer of record is not an employee of the Underwriters. The notice of cancellation shall state the reason for cancellation. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the Underwriters shall be equivalent to mailing.

If this Policy is cancelled pursuant to first or second paragraph hereinabove, the Underwriters shall retain the pro-rata portion of the premium hereon. Payment or tender of any unearned premium by the Underwriters shall not be a condition precedent to the effectiveness of cancellation.

If the Underwriters decide not to renew this Policy, or to condition renewal upon reduction of the Policy's Limit of Liability, elimination of coverages, increase in the Each **Claim** Deductible, or increase of more than twenty-five percent (25%) in the rate upon which the premium is based, the Underwriters shall mail or deliver written notice to the **Named Insured**, at the mailing address shown on the Policy, at least sixty (60) days, but not more than one hundred and twenty (120) days, before the end of the **Policy Period**. Notice of nonrenewal or conditional renewal shall also be sent to the producer of record, if applicable, provided that the producer of record is not an employee of the Underwriters. The notice of nonrenewal shall state the reason for nonrenewal.

The regulatory requirements set forth in this Amendatory Endorsement shall supersede and take precedence over any provisions of this Policy or any endorsement to this Policy, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such Policy or endorsement provisions comply with the applicable insurance laws of this state.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## NUCLEAR EXCLUSION

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that this Policy does not apply:

I. Under any Liability Coverage, to injury, sickness, disease, death or destruction:

(a) with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III. Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## SANCTION LIMITATION AND EXCLUSION CLAUSE

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, law or regulations of the European Union, United Kingdom or United States of America.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## WAR AND CIVIL WAR EXCLUSION

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that **EXCLUSIONS** is amended to include:

**War and Civil War**

for, resulting from, directly or indirectly occasioned by, happening through or in consequence of: war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority; provided, that this exclusion will not apply to **Cyber Terrorism**.

For purposes of this exclusion, "**Cyber Terrorism**" means the premeditated use of disruptive activities, or threat to use disruptive activities, against a computer system or network with the intention to cause harm, further social, ideological, religious, political or similar objectives, or to intimidate any person(s) in furtherance of such objectives.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**AGGREGATE/MAINTENANCE RETENTION**

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The maximum aggregate Retention for all Claims made during any Policy Year under this Policy shall be $30,000 provided, that the each Claim Retention set forth in item 3. below shall not be subject to any aggregate Retention.
2. For purposes of this endorsement, the term "Policy Year" means each 365 day period beginning with the Inception Date of the Policy Period and each such succeeding Policy Period, if any.
3. With respect to any Claim made in any Policy Year after the maximum aggregate Retention is reached for that Policy Year, the each Claim Retention shall be $0.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## AMEND DEFINITION OF FRAUDULENT INSTRUCTION

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the definition of **Fraudulent Instruction** is deleted in its entirety and replaced with the following:

> **Fraudulent Instruction** means the transfer, payment or delivery of **Money** or **Securities** by an **Insured** as a result of fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions provided by a third party, that is intended to mislead an **Insured** through the misrepresentation of a material fact which is relied upon in good faith by such **Insured.**
>
> **Fraudulent Instruction** will not include loss arising out of:
>
> 1. any actual or alleged use of credit, debit, charge, access, convenience, customer identification or other cards;
> 2. any transfer involving a third party who is not a natural person **Insured**, but had authorized access to the **Insured's** authentication mechanism;
> 3. the processing of, or the failure to process, credit, check, debit, personal identification number debit, electronic benefit transfers or mobile payments for merchant accounts;
> 4. accounting or arithmetical errors or omissions, or the failure, malfunction, inadequacy or illegitimacy of any product or service;
> 5. any liability to any third party, or any indirect or consequential loss of any kind;
> 6. any legal costs or legal expenses; or
> 7. proving or establishing the existence of **Fraudulent Instruction**.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## COMPUTER HARDWARE REPLACEMENT COST

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The definition of **Extra Expense** is deleted in its entirety and replaced with the following:

   **Extra Expense** means reasonable and necessary expenses incurred by the **Insured Organization** during the **Period of Restoration** to minimize, reduce or avoid **Income Loss**, over and above those expenses the **Insured Organization** would have incurred had no **Security Breach**, **System Failure**, **Dependent Security Breach** or **Dependent System Failure** occurred; and includes reasonable and necessary expenses incurred by the **Insured Organization** to replace computers or any associated devices or equipment operated by, and either owned by or leased to, the **Insured Organization** that are unable to function as intended due to corruption or destruction of software or firmware directly resulting from a **Security Breach**, provided however that the maximum sublimit applicable to **Extra Expense** incurred to replace such devices or equipment is USD $100,000.

2. Part 2. of the **Bodily Injury or Property Damage** exclusion is deleted in its entirety and replaced with the following:

   2. physical injury to or destruction of any tangible property, including the loss of use thereof; but this will not apply to the loss of use of computers or any associated devices or equipment operated by, and either owned by or leased to, the **Insured Organization** that are unable to function as intended due to corruption or destruction of software or firmware directly resulting from a **Security Breach**. Electronic data shall not be considered tangible property;

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

**CONTINGENT BODILY INJURY WITH SUBLIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The **Bodily Injury or Property Damage** exclusion is deleted in its entirety and replaced with the following:

   **Bodily Injury or Property Damage**

   1. **Bodily Injury**; provided, this exclusion shall not apply to any **Claim** for **Contingent Bodily Injury**; and

   2. physical injury to or destruction of any tangible property, including the loss of use thereof; but electronic data will not be considered tangible property;

2. **DEFINITIONS** is amended by the addition of:

   **Bodily Injury** means physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress that results from such physical injury, sickness, disease or death.

   **Contingent Bodily Injury** means those **Claims** wherein the **Damages** sought by the claimant are for **Bodily Injury** which arise solely out of a **Security Breach** affecting the **Insured Organization's Computer Systems** which is otherwise covered under the terms and conditions of this Policy; but not if the **Insured's** own act, error or omission is the direct immediate cause of such **Claim** for **Bodily Injury**. Furthermore, this extension of coverage applies only if such **Claim** for **Bodily Injury** is not covered under any other policy of insurance.

3. The Underwriter's aggregate limit of liability for all **Damages** resulting from all **Claims** covered under this Endorsement, made against any **Insured(s)** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any **Contingent Bodily Injury** shall be $250,000, which amount shall be part of and not in addition to the **Policy Aggregate Limit of Liability.**

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## CRISIS MANAGEMENT EXPENSE COVERAGE

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The Limits listed in the Declarations under **COVERAGE SCHEDULE** are amended to include:

   **Crisis Management Expense**s: $1,000,000

2. **INSURING AGREEMENTS** is amended to include the following:

   To indemnify the **Named Insured** for 100% of the costs of a public relations consultancy incurred by the **Insured Organization** with Underwriters' prior written consent, for the purpose of averting or mitigating material damage to the **Insured Organization's** reputation that results or reasonably will result from a **Claim** covered under by the Policy and publicized through any media channel ("**Crisis Management Expenses**"); provided, this coverage shall only apply when covered **Damages** other than (crisis management expenses) exceeds the applicable **Retention**.

3. The definition of **Damages** is amended to include **Crisis Management Expenses**.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## CRYPTOJACKING ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The aggregate sublimit applicable to all loss under this endorsement is USD $100,000.

2 The Retention applicable to each incident, event, or related incidents or events, giving rise to an obligation to pay loss under this endorsement shall be USD $10,000.

3. **INSURING AGREEMENTS** is amended to include:

**Cryptojacking**

To indemnify the **Insured Organization** for any direct financial loss sustained resulting from **Cryptojacking** that the **Insured** first discovers during the **Policy Period**.

4. **DEFINITIONS** is amended to include:

**Cryptojacking** means the **Unauthorized Access or Use** of **Computer Systems** to mine for **Digital Currency** that directly results in additional costs incurred by the **Insured Organization** for electricity, natural gas, oil, or internet (the "**Utilities**"); provided, however, that such additional costs for the **Utilities** are:

1. incurred pursuant to a written contract between the **Insured Organization** and the respective utility provider, which was executed before the **Cryptojacking** first occurred;

2. billed to the **Insured Organization** by statements issued by the respective utility provider, which include usage or consumption information;

3. not charged to the **Insured Organization** at a flat fee that does not scale with the rate or use of the respective utility; and

4. incurred pursuant to statements issued by the respective utility provider and due for payment during the **Policy Period**.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## EMPLOYEE DEVICE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the definition of **Computer Systems** is amended to include computers, any software residing on such computers and any associated devices or equipment (including but not limited to wireless or mobile devices), operated by any person listed in parts 2., 3. or 4. of the **Insured** definition, but only for work done while acting within the scope of his or her employment and related to the conduct of the **Insured Organization's** business.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## GDPR CYBER ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the definition of **Data & Network Wrongful Act** is amended to include the following:

5. non-compliance with the following obligations under the EU General Data Protection Regulation:

    (i) Article 5.1(f), also known as the Security Principle;

    (ii) Article 32, Security of Processing;

    (iii) Article 33, Communication of a Personal Data Breach to the Supervisory Authority; or

    (iv) Article 34, Communication of a Personal Data Breach to the Data Subject.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## INVOICE MANIPULATION COVERAGE

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The aggregate sublimit applicable to all loss under this endorsement is USD $100,000.

2. The Retention applicable to each incident, event, or related incidents or events, giving rise to an obligation to pay loss under this endorsement shall be USD $10,000.

3. **INSURING AGREEMENTS** is amended to include:

   **Invoice Manipulation**

   To indemnify the **Insured Organization** for **Direct Net Loss** resulting directly from the **Insured Organization's** inability to collect **Payment** for any goods, products or services after such goods, products or services have been transferred to a third party, as a result of **Invoice Manipulation** that the **Insured** first discovers during the **Policy Period**:

4. **DEFINITIONS** is amended to include:

   **Direct Net Loss** means the direct net cost to the **Insured Organization** to provide goods, products or services to a third party. **Direct Net Loss** will not include any profit to the **Insured Organization** as a result of providing such goods, products or services.

   **Invoice Manipulation** means the release or distribution of any fraudulent invoice or fraudulent payment instruction to a third party as a direct result of a **Security Breach** or a **Data Breach**.

   **Payment** means currency, coins or bank notes in current use and having a face value.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## Post Breach Remedial Services Endorsement

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that, following a covered **Data Breach** or **Security Breach** involving the actual **Unauthorized Access or Use** of the **Insured Organization's Computer Systems** for which the **Insured Organization** has utilized services exclusively from **Beazley Service Providers**, the **Insured Organization** will be eligible to receive **Post Breach Remedial Services**.

**Post Breach Remedial Services** means up to 100 hours per **Policy Period** of post-breach computer security consultation and remedial services to be provided by Lodestone Security ("Lodestone"). Such services will be provided at the **Insured Organization's** request as per the description of services attached to this endorsement. **Post Breach Remedial Services** will be considered **Breach Response Costs**, and will be available in response to incidents in which forensic costs covered under parts 2. and 3. of the definition of **Breach Response Costs** have been incurred, subject to the applicable Retention. **Post Breach Remedial Services** will not include any costs to purchase or upgrade any hardware or software.

To access the **Post Breach Remedial Services**, the **Insured Organization** must:

1. notify the Beazley Breach Response Services Team via email at: *bbr.claims@beazley.com* or via a toll-free 24-Hour Hotline: (866) 567-8570 following any actual or reasonably suspected **Unauthorized Access or Use** of the **Insured Organization's Computer Systems** so that the Beazley Breach Response Services Team can work with the **Insured Organization** to coordinate the provision of services from **Beazley Service Providers**;

2. notify the Underwriters that they desire to receive such services; and

3. enter into an engagement agreement with Lodestone to receive such service,

within sixty (60) days following a determination of the actual **Unauthorized Access or Use** of the **Insured Organization's Computer Systems**,

For purpose of this Endorsement, "**Beazley Service Providers**" means the Underwriters' network of third party breach response service providers listed at www.beazley.com/cyberservices that are to be utilized exclusively in response to incidents in which forensic costs covered under parts 2. and 3. of the definition of **Breach Response Costs** have been/will be incurred, subject to the applicable Retention.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## REPUTATION LOSS

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. Limit listed in the Declarations under **COVERAGE SCHEDULE** is amended to include:

   **Reputation Loss**: USD $1,000,000

2. Retention listed in the Declarations under **COVERAGE SCHEDULE** is amended to include:

   Each incident giving rise to **Reputation Loss**: USD $10,000

3. **INSURING AGREEMENTS** is amended by the addition of:

   **Reputation Loss**

   To indemnify the **Insured Organization** for **Reputation Loss** that the **Insured Organization** sustains solely as a result of an **Adverse Media Event** that occurs during the **Policy Period**, concerning:

   1. a **Data Breach, Security Breach,** or **Extortion Threat** that the **Insured** first discovers during the **Policy Period**; or

   2. if this policy is a **Renewal**, a **Data Breach, Security Breach,** or **Extortion Threat** that the **Insured** first discovers during the last 90 days of the prior policy period.

4. **DEFINITIONS** is amended to include:

   **Adverse Media Event** means:

   1. publication by a third party via any medium, including but not limited to television, print, radio, electronic, or digital form of previously non-public information specifically concerning a **Data Breach, Security Breach**, or **Extortion Threat;** or

   2. notification of individuals pursuant to part 4. of the **Breach Response Costs** definition.

   Multiple **Adverse Media Events** arising from the same or a series of related, repeated or continuing **Data Breaches, Security Breaches,** or **Extortion Threats**, shall be considered a single **Adverse Media Event**, and shall be deemed to occur at the time of the first such **Adverse Media Event**.

   **Claims Preparation Costs** means reasonable and necessary costs that the **Named Insured** incurs to contract with a third party to prepare a proof of loss demonstrating **Reputational Loss**.

**Protection Period** means the period beginning on the date the **Adverse Media Event** occurs, and ends after the earlier of:

1. 180 days; or

2. the date that gross revenues are restored to the level they would have been but for the **Adverse Media Event**.

**Renewal** means an insurance policy issued by the Underwriters to the **Named Insured** for the policy period immediately preceding this **Policy Period** that provides coverage for a **Data Breach**, **Security Breach**, or **Extortion Threat** otherwise covered under this Policy.

**Reputation Loss** means:

1. the net profit or loss before interest and tax that the **Insured Organization** would have earned during the **Protection Period** but for an **Adverse Media Event**; and

2. continuing normal operating expenses incurred by the **Insured Organization** (including payroll), but only to the extent that such operating expenses must necessarily continue during the **Protection Period**.

When calculating any **Reputation Loss**, due consideration will be given to any amounts made up during, or within a reasonable time after the end of, the **Protection Period.**

**Reputation Loss** will not mean and no coverage will be available under this endorsement for any of the following:

(i) loss arising out of any liability to any third party;

(ii) legal costs or legal expenses of any type;

(iii) loss incurred as a result of unfavorable business conditions;

(iv) loss of market or any other consequential loss;

(v) **Breach Response Costs**; or

(vi) **Cyber Extortion Loss**;

There will be no coverage available under this endorsement if there is an actual interruption of the **Insured Organization's** business operations for any period of time.

5. **Limits of Liability** under **LIMIT OF LIABILITY AND COVERAGE** is amended to include:

**Reputational Loss** and **Claims Preparation Costs** covered under this Policy arising from an **Adverse Media Event** concerning any **Data Breach**, **Security Breach**, or **Extortion Threat** (including a series of related, repeated or continuing **Data Breaches**, **Security Breaches**, or **Extortion Threats**) first discovered during the last 90 days of the prior policy period, will be considered to have been noticed to the Underwriters during the prior policy period and will be subject to the **Policy Aggregate Limit of Liability** of the prior policy period. Under such circumstances, if the **Policy Aggregate Limit of Liability** of the prior policy period is exhausted due to payments made under the prior policy, the Underwriter's obligation to pay **Reputational Loss** or **Claims Preparation Costs** under this Policy shall be completely fulfilled and extinguished.

6. **Notice of Claim or Loss** under **GENERAL CONDITIONS** is amended to include:

With respect to **Reputation Loss**, the **Named Insured** must notify the Underwriters through the contacts listed for **Notice of Claim, Loss or Circumstance** in the Declarations as soon as practicable after discovery of the circumstance, incident or event giving rise to such loss.

All **Reputation Loss** must be reported, and all proofs of loss must be provided, to the Underwriters no later than four (4) months after the end of the **Protection Period**.

7. This Policy will cover up to USD 50,000 of **Claims Preparation Costs** in excess of the Retention stated in Section 2. of this endorsement.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## STATE CONSUMER PRIVACY STATUTES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. The Policy is amended to include the following insuring agreement:

    **State Consumer Privacy Statutes**

    To pay **Penalties** and **Claims Expenses** which the **Insured** is legally obligated to pay because of any **Regulatory Proceeding** first made against any **Insured** during the **Policy Period** for a violation of the California Consumer Privacy Act or any similar state statutes or state regulations specifically governing the **Insured Organization's** collection, use, disclosure, sale, processing, profiling, acquisition, sharing, maintenance, retention or storage of or provision of access to personal information or personal data as defined under the California Consumer Privacy Act or similar state statutes or state regulations.

2. The definition of **Claim** is amended to include institution of a **Regulatory Proceeding** against any **Insured** under the State Consumer Privacy Statutes insuring agreement for a violation of the California Consumer Privacy Act or any similar state statutes or state regulations specifically governing the **Insured Organization's** collection, use, disclosure, sale, processing, profiling, acquisition, sharing, maintenance, retention or storage of or provision of access to personal information or personal data as defined under the California Consumer Privacy Act or similar state statutes or state regulations.

3. The **Governmental Actions** exclusion will not apply to the State Consumer Privacy Statutes insuring agreement.

4. Solely with respect to the State Consumer Privacy Statutes insuring agreement, the **Deceptive Business Practices, Antitrust & Consumer Protection** exclusion is deleted in its entirety and replaced with the following:

    **Deceptive Business Practices and Consumer Protection**

    any actual or alleged false, deceptive or unfair trade practices, unfair competition, or violation of consumer protection law; but this exclusion will not apply to coverage under the State Consumer Privacy Statutes insuring agreement, provided no member of the **Control Group** participated in or colluded in the activities or incidents giving rise to coverage under such insuring agreement;

    **Antitrust**

    any actual or alleged antitrust violation, restraint of trade, false, deceptive or misleading advertising, violation of the Sherman Antitrust Act, the Clayton Act, or the Robinson-Patman Act, or inaccurate cost estimates or failure of goods or services to conform with any represented quality or performance;

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## AMEND DEFINITION OF ADDITIONAL INSURED TO INCLUDE SCHEDULED ENTITY(IES)

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that the definition of **Additional Insured** is amended to include:

1. NBKC Bank

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

**Effective date of this Endorsement: 10-Dec-2022**
**This Endorsement is attached to and forms a part of Policy Number: VG00002419AD**
**Beazley Insurance Company, Inc. referred to in this endorsement as either the "Insurer" or the "Underwriters"**

## DELETE COVERAGE FOR PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**Beazley MediaTech**

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

1. Part 1. of the **Media, Tech, Data, & Network Liability** Insuring Agreement is deleted in its entirety and replaced with the following:

    1. **Tech Services Wrongful Act**;

2. The first paragraph of the definition of **Media Wrongful Act** is deleted in its entirety and replaced with the following:

    **Media Wrongful Act** means one or more of the following acts committed on or after the **Retroactive Date** and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Media Activities** or **Tech Services**:

3. The definition of **Professional Services** is deleted in its entirety.

4. The definition of **Tech & Professional Services Wrongful Act** is deleted in its entirety and replace with the following:

    **Tech Services Wrongful Act** means any negligent act, error, omission, misstatement, misleading statement, misrepresentation or unintentional breach of a contractual obligation by the **Insured**, or by any person or entity for whom the **Insured** is legally liable, in rendering or failing to render **Tech Services** that occurs on or after the **Retroactive Date** and before the end of the **Policy Period**, but does not mean a **Media Wrongful Act**.

5. The Contractual and Recall exclusions are amended to remove all references to **Professional Services**.

6. The coverage under this Policy will not apply to any **Loss** arising out of activities performed by or on behalf of the **Insured Organization** as an accountant, architect, surveyor, health care provider, lawyer, insurance or real estate agent or broker, or civil or structural engineer.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

EMPOWER FEDERAL CREDIT UNION,

Plaintiff,

v.

EMPOWER FINANCE, INC.,

Defendant.

Civil Action No: 5:22-cv-1302 (BKS/ATB)

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff, Empower Federal Credit Union, complaining of the defendant in the above-entitled action, by Heslin Rothenberg Farley & Mesiti. P.C., its attorneys, alleges as follows:

**JURISDICTION AND VENUE**

1. This is an action for service mark infringement and unfair competition, arising under various provisions of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, for state common law service mark infringement, unfair competition and palming off, for service mark dilution under N.Y. Gen. Bus. Law § 360-l, for deceptive trade practice under N.Y. Gen. Bus. Law § 349, and for unfair competition under N.Y. Gen. Bus. Law §§349 and 350.

2. This Court has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §§ 1331 and 1338 and over the state claims pursuant to 28 U.S.C. § 1367.

3. This Court has personal jurisdiction over the Defendant, pursuant to N.Y. C.P.L.R. 302(a), by virtue of Defendant's transaction of business within the State of New York, commission of tortious activity (e.g., service mark infringement and unfair competition) within the State of New York, and commission of tortious activity while regularly soliciting business within the State of New York.

4. Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b) because the Defendant conducts business in this judicial district and a substantial part of the events giving rise to the claims occurred in this judicial district, including Defendant's advertisement and sale of goods and services in this judicial district.

**PARTIES**

5. Empower Federal Credit Union (hereinafter, "Plaintiff") is a federally chartered credit union having an address of 1 Member Way, Syracuse, New York 13212.

6. Upon information and belief, Empower Finance, Inc. (hereinafter, "Defendant"), is a corporation operating under the laws of Delaware with a principal office at 660 York Street, Suite 102, San Francisco, California 94110.

**BACKGROUND FACTS**

**Plaintiff and Its Use of the Empower Marks**

7. Operating out of central New York to customers throughout the United States, Plaintiff is a financial services company offering banking, online banking, loans, and credit card services, amongst other services, to its customers.

8. Plaintiff owns the right, title and interest in U.S. Trademark Registration No. 4,418,865 for EMPOWER FEDERAL CREDIT UNION covering "Financial services for credit union members, namely, savings, checking, retirement, and education savings accounts, loan financing for personal, real property and student loans, automated teller machine services, credit card services, debit card services, on line banking services" in International Class 36 (the "Word Mark Registration"). The Word Mark Registration registered at the United States Patent and Trademark Office on October 15, 2013.

9. Plaintiff owns the right, title and interest in U.S. Trademark Registration No. 4,428,988 for EMPOWER FEDERAL CREDIT UNION covering "Financial services for credit union members, namely, savings, checking, retirement, and education savings accounts, loan financing for personal, real property and student loans, automated teller machine services, credit card services, debit card services, on line banking services" in International Class 36 (the "Design Mark Registration"). The Design Mark Registration registered at the United States Patent and Trademark Office on November 5, 2013.

10. Registration Nos. 4,418,865 and 4,428,988 are incontestable, valid and subsisting and therefore constitute prima facie evidence of the validity of the marks set forth in these registrations and Plaintiff's exclusive right to use these marks in connection with the services set forth in these registrations. Certificates of Registration covering the registered Empower Marks are attached as **Exhibit A**.

11. Plaintiff further owns common law rights in numerous trademarks and service marks including "EMPOWER", covering various services including, but not limited to, banking, online banking, loans, credit card, wealth management, mortgage, and term life insurance services.

12. The preceding registered and unregistered trademarks are collectively referred to herein as the "Empower Marks". Plaintiff has used each of the Empower Marks in commerce since at least as early as January 1, 2007.

13. Plaintiff was created in 2007 as a result of the merger between two Central New York credit unions: Power Federal Credit Union and Empire Federal Credit Union. At that time, the Empower Marks were adopted both as a combination of the names of Plaintiff's predecessors and as an indication of the feeling evoked from the use of Plaintiff's services.

14. Since 2007, Plaintiff has offered services such as banking, credit, loans, tax, term life insurance, wealth management and other services in interstate commerce in connection with each of the Empower Marks.

15. Plaintiff operates out of approximately 28 physical locations as well as on-line, Plaintiff services its customers throughout the United States. Plaintiff's customers reside and travel to various states and have access to Plaintiff's services on-line as well as at over 55,000 ATM locations throughout the United States. As of 2022, Plaintiff has provided its services to over tens of thousands of users and/or customers under the Empower Marks, and has processed millions of financial transactions.

16. The Empower marks have been and are used extensively by Plaintiff in offering its services including on its website, mobile app, credit cards, debit cards, customer documents, physical locations, advertisements and account interfaces, Plaintiff has advertised and promoted its services under the Empower marks in various media including radio, television, print as well as social media. The Empower Marks have been used in connection with substantial consumer sales and deposits as well as in advertising and promotion and function as identifying services originating from, sponsored by, or associated with Plaintiff. Plaintiff and the Empower Marks have acquired an extensively acclaimed reputation for excellence among financial institutions.

17. Plaintiff has spent and continues to spend large sums of money in the promotion, advertisement, and sale of its services under the Empower Marks, and by reason of such advertising and the high quality of its services carrying such service marks, Plaintiff enjoys a valuable goodwill and an enviable reputation with respect to its service marks and, in particular, the services associated therewith.

**Defendant and its Unauthorized Use of the Empower Marks**

18.  Defendant, Empower Finance, Inc. incorporated in the State of Delaware on March 18, 2016 as a financial technology company that offers banking and credit services to consumers. As such, Plaintiff's use of the Empower Marks predates the existence of Defendant by over nine years.

19.  Defendant has offered its banking and financial services to consumers under the name "EMPOWER", a mark confusingly similar to the Empower Marks.

20.  Specifically, Defendant has offered a product called the "Empower Card," as shown from the below screenshot from Defendant's website (https://empower.me/):



21.  As demonstrated above, Defendant's "Empower Card" is a debit card, a product typically offered by banks, credit unions and similar financial institutions.

22.     Defendant's website further indicates that they offer services related to checking accounts through their "Empower" brand, another service that is typically reserved for banks and credit unions, such as Plaintiff.  See:



23.     Additionally, Defendant offers loans such as cash advances and lines of credit through its "Empower" brand.  See examples from Defendant's website:





24. Upon information and belief, Defendant offers its financial products and services throughout the United States, including in the State of New York and the area encompassed by this judicial district.

25. Defendant advertises its "Empower" products and services through its website, social media and via television and internet advertisements that air nationwide.

26. Defendant's products and services are offered to the same types of consumers to whom Plaintiff's services are offered.

27. Defendant's use of "Empower" in connection with the goods and services demonstrated above, is confusingly similar to Plaintiff's Empower Marks for various financial services due to the highly similar appearance, sound and connotation of the marks themselves, and the similarity of goods, services and respective trade channels.

28. Defendant has used and continue to use infringing variations of the Empower marks after these marks were used and registered by Plaintiff in the commercial market in which both Defendant and Plaintiff compete.

29. On October 22, 2022, Plaintiff sent a cease and desist letter (the "Cease and Desist Letter") to Defendant demanding that the Defendant immediately cease and desist all unauthorized use of Empower, or any similar variation thereof, in connection with offering loans, banking, credit and credit card related services, and in association with the advertisement, promotion or sale of its services, including, but not limited to discontinuing use of all sales literature, signs, marketing and promotional materials containing this mark, and removing the mark from all products, press releases, promotional materials and websites. The Cease and Desist Letter gave Defendant until November 1, 2022 to respond. See **Exhibit B.**

30. As of the date of the filing of this Complaint, Defendant failed to respond to the Cease and Desist Letter, and Defendant's use of its "Empower" mark continued.

31. Due to Defendant's knowledge of Plaintiff's Empower Marks, Defendant has had and continues to have bad faith intent to profit commercially from the Empower Marks.

**COUNT I – SERVICE MARK INFRINGEMENT OF U.S. REG. NO. 4,418,865 UNDER 15 U.S.C. § 1114**

32. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 31 as if they were stated in full herein.

33. Plaintiff owns the rights to United States Registered Trademark No. 4,418,865 for "EMPOWER FEDERAL CREDIT UNION".

34. Defendant has used in commerce, without Plaintiff's consent, designations which use the term "Empower" which constitute reproductions, counterfeits, copies or colorable imitations of the "EMPOWER FEDERAL CREDIT UNION" mark in connection with the sale,

offer for sale, distribution and/or advertising of its products and services, such use being likely to cause confusion, to cause mistake, or to deceive.

35. Specifically, Defendant has used confusingly similar variations of the "EMPOWER FEDERAL CREDIT UNION" mark in the promotion and offering of loans, banking, credit and credit card related services as well as possibly other services.

36. Defendant's activities created a likelihood that consumers will be confused as to source, sponsorship, and/or affiliation, or to cause mistake or to deceive.

37. The actions of Defendant described in this Count constitute service mark infringement in violation of 15 U.S.C. § 1114. Defendant's actions have caused, and, unless enjoined by this Court, will continue to cause serious and irreparable injury to Plaintiff, for which Plaintiff has no adequate remedy at law.

38. The actions of Defendant described in this Count have also caused damage to Plaintiff, for which Plaintiff should be compensated by Defendant.

**COUNT II – SERVICE MARK INFRINGEMENT OF U.S. REG. NO. 4,428,988 UNDER 15 U.S.C. § 1114**

39. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 38 as if they were stated in full herein.

40. PLAINTIFF owns the rights to United States Registered Trademark No. 4,428,988 for 

.

41. Defendant has used in commerce, without Plaintiff's consent, designations which use the term "Empower" which constitute reproductions, counterfeits, copies or colorable imitations of the 

mark in connection with the sale, offer for sale,

distribution and/or advertising of its products and services, such use being likely to cause confusion, to cause mistake, or to deceive.

42. Specifically, Defendant has used confusingly similar variations of the mark in the promotion and offering of loans, banking, credit and credit card related services as well as possibly other services.

43. Defendant's activities created a likelihood that consumers will be confused as to source, sponsorship, and/or affiliation, or to cause mistake or to deceive.

44. The actions of Defendant described in this Count constitute trademark infringement in violation of 15 U.S.C. § 1114. Defendant's actions have caused, and, unless enjoined by this Court, will continue to cause serious and irreparable injury to Plaintiff, for which Plaintiff has no adequate remedy at law.

45. The actions of Defendant described in this Count have also caused damage to Plaintiff, for which Plaintiff should be compensated by Defendant.

**COUNT III – FALSE DESIGNATION OF ORIGIN**
**15 U.S.C. § 1125(a)**

46. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 45 as if they were stated in full herein.

47. Defendant has, without Plaintiff's consent, on or in connection with products and services, used colorable imitations of the Empower Marks in commerce in a manner which is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection and/or association of Defendant with Plaintiff and its services bearing the Empower Marks, and/or as to the origin, sponsorship, and/or approval by Plaintiff of Defendant's unauthorized goods and services.

48. The actions of Defendant described in this Count constitute false designations of origin in violation of 15 U.S.C. § 1125(a). Defendant's acts have caused and, unless enjoined by this Court, will continue to cause serious and irreparable injury to Plaintiff for which Plaintiff has no adequate remedy at law.

49. The acts of Defendant described in this Count have also caused damage to Plaintiff for which Plaintiff should be compensated by Defendant.

**COUNT IV – COMMON LAW**
**SERVICE MARK INFRINGEMENT OF "EMPOWER"**

50. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 49 as if they were stated in full herein.

51. Plaintiff owns common law rights to the trademark "EMPOWER" for banking, credit union, credit and loan services.

52. Defendant has used in commerce, without Plaintiff's consent, reproductions, counterfeits, copies or colorable imitations of the "EMPOWER" mark in connection with the sale, offer for sale, distribution and/or advertising of its products and services, such use being likely to cause confusion, to cause mistake, or to deceive.

53. Specifically, Defendant has used the "EMPOWER" mark in the promotion and offering of loans, banking, credit and credit card related services as well as possibly other services.

54. Defendant's activities created a likelihood that consumers will be confused as to source, sponsorship, and/or affiliation, or to cause mistake or to deceive.

55. The actions of Defendant described in this Count constitute service mark infringement in violation of common law. Defendant's actions have caused, and, unless enjoined by this Court, will continue to cause serious and irreparable injury to Plaintiff, for which Plaintiff has no adequate remedy at law.

56. The actions of Defendant described in this Count have also caused damage to Plaintiff, for which Plaintiff should be compensated by Defendant.

**COUNT V – COMMON LAW STATE**
**UNFAIR COMPETITION AND PALMING OFF**

57. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 56 as if they were stated in full herein.

58. Plaintiff, as a cause of action and ground for relief, alleges that Defendant is engaging in unfair competition and misappropriation in violation of the common law of the State of New York.

59. Defendant has infringed the Empower Marks and continue to do so by marketing and/or selling goods and services using colorable imitations of the Empower Marks.

60. Defendant's acts constitute deception, fraud, misrepresentation, or the concealment, suppression or omission of a material fact, such as that Plaintiff and Defendant are not affiliated.

61. Upon information and belief, Defendant intends to benefit from the goodwill and reputation of Plaintiff and that others rely upon its unfair methods of competition and unfair or deceptive trade practices.

62. Defendant's deceptive business practices involve conduct addressed to the market generally and implicate consumer protection concerns because the deceptive practices have caused and continue to cause injury to consumers. Unless Defendant's acts are restrained by this Court, Defendant's deceptive business practices will continue and the public will continue to suffer great and irreparable injury.

63. Defendant's acts are likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association with Plaintiff, or origin, sponsorship, or affiliation of Defendant by Plaintiff.

64. Defendant's acts are likely to severely damage Plaintiff's goodwill.

65. Defendant has misappropriated the Empower Marks by using colorable imitations of the Empower Marks on or in connection with the advertising, marketing, promotion and sale of Defendant's goods and services.

66. Defendant's aforesaid acts constitute passing off, tarnishment, dilution, misappropriation, and misuse of Plaintiff's trademark, unfair competition, palming-off and passing-off against Plaintiff, and unjust enrichment by Defendant, all in violation of Plaintiff's rights under the common law of New York.

67. Upon information and belief, Defendant's actions have been willful and deliberate.

68. Plaintiff has suffered, and continues to suffer, substantial and irreparable injury as a result of Defendant's deceptive business practices and therefore Plaintiff is entitled to injunctive relief under New York common law.

**COUNT VI – TRADEMARK DILUTION**
**UNDER N.Y. GEN. BUS. LAW § 360-l**

69. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 68 as if they were stated in full herein.

70. Defendant's activities have created and continue to create a likelihood of injury to the public image and reputation of Plaintiff, and to dilute the distinctive quality of the Empower Marks and all rights held thereunder, in violation of the General Business Law of the State of New York.

71. By reason of the foregoing, Defendant has violated and continues to violate N.Y. Gen. Bus. Law § 360-l.

72. Such conduct on the part of Defendant had caused and will continue to cause irreparable injury to Plaintiff, for which Plaintiff has no adequate remedy at law.

73. Such conduct on the part of Defendant has caused and will continue to cause damages to Plaintiff in an amount to be determined.

**COUNT VII -DECEPTIVE TRADE PRACTICES**
**<u>UNDER N.Y. GEN. BUS. LAW § 349</u>**

74. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 73 as if they were stated in full herein.

75. In the course of its business, Defendant has wrongfully and deceptively engaged in consumer-oriented unfair trade practices that are misleading in a material way, and that cause injury to Plaintiff and the public.

76. Defendant's activities and use of the Empower Marks misleads consumers regarding the relationship, affiliation or sponsorship between Plaintiff and Defendant and the origin of Defendant's services.

77. Defendant's unfair deceptive business practices involve conduct directed at consumers and implicate consumer protection concerns because the deceptive practices have caused and continue to cause injury to consumers.

78. Defendant's activities are willful and have been undertaken in bad faith.

79. Defendant's willful activities constitute deceptive acts and practices causing harm and injury to the public at large, as well as Plaintiff, in violation of N.Y. Gen. Bus. Law § 349.

80. Defendant's conduct is causing immediate and irreparable injury to Plaintiff and to its goodwill and reputation and will continue both to damage Plaintiff and deceive the public unless enjoined by this Court.

81. Plaintiff has no adequate remedy at law and is entitled to injunctive relief. Plaintiff is further entitled to recover Defendant's trebled profits, Plaintiff's costs, and Plaintiff's reasonable attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349.

COUNT VIII – UNFAIR COMPETITION
UNDER N.Y. GEN. BUS. LAW §§349 and 350

82. Plaintiff repeats and reasserts all allegations in Paragraphs 1 through 81 as if they were stated in full herein.

83. In the course of business, Defendant has wrongfully and deceptively engaged in consumer-oriented acts that were misleading in a material way, and that caused injury to Plaintiff.

84. Defendant's conduct as described herein constituted and continues to constitute a violation of New York General Business Law §§349 and 350.

85. By reason of the foregoing, Plaintiff has been and will be irreparably harmed and damaged.

86. The acts of the Defendant complained of herein have damaged Plaintiff and, unless restrained, will impair, if not destroy, the value of Plaintiff's reputation and goodwill.

WHEREFORE, Plaintiff Empower Federal Credit Union prays:

a) that Defendant be found to have infringed Plaintiff's rights in the Empower Marks and that Defendant be found liable on each of the causes of action enumerated in this Complaint;

b) that Defendant, its officers, directors, employees, agents and affiliated entities, and all persons in active participation or concert with Defendant, be preliminarily and permanently enjoined from infringing the Empower Marks, or any colorable imitation thereof, and from engaging in false designation of origin in any other manner;

c) that Defendant be required to deliver up and/or to destroy any and all products and other items infringing the Empower Marks in its possession, as well as all labels, literature, and advertisements bearing the marks, together with any means for producing same;

d) that Defendant be ordered to pay damages to Plaintiff adequate to compensate Plaintiff for the acts described in this Complaint, that such damages be trebled, and that Defendant be ordered to pay Plaintiff its reasonable attorneys' fees; and

e) that Plaintiff have such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December 5, 2022

Respectfully submitted,

**s/Nicholas Mesiti**____________________________

Nicholas Mesiti, Esq. (*NDNY Bar No. 102192*)
Thomas L. Sica, Esq. (*NDNY Bar No. 520638*)
HESLIN ROTHENBERG FARLEY & MESITI P.C.
5 Columbia Circle
Albany, NY 12203
Telephone: (518) 452-5600
Facsimile: (518) 452-5579
Email: nick.mesiti@hrfmlaw.com
Email: thomas.sica@hrfmlaw.com

*Attorneys for Plaintiff, Empower Federal Credit Union*

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. ______________________

EMPOWER ANNUITY INSURANCE COMPANY OF AMERICA, a Colorado corporation,

Plaintiff,

v.

EMPOWER FINANCE, INC.,

Defendant.

---

**COMPLAINT FOR TRADEMARK INFRINGEMENT,
UNFAIR COMPETITION AND DECEPTIVE BUSINESS PRACTICES**

---

Plaintiff Empower Annuity Insurance Company of America ("Empower"), through its counsel, states and alleges as follows against Defendant Empower Finance, Inc. ("EF"):

**NATURE OF ACTION**

1. This is an action for federal trademark infringement under the Lanham Act of 1946, as amended, 15 U.S.C. §§ 1114 *et seq*., federal unfair competition under 15 U.S.C. § 1125(a)(1)(A), common law trademark infringement and unfair competition under Colorado law, and deceptive business practices under Colo. Rev. Stat. § 6-1-105.

**PARTIES**

2. Empower is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in Greenwood Village, Colorado.

3. Empower is a leading provider of financial products and services in the United States, as discussed in detail in paragraphs 19-49. Empower is also the owner of the www.empower.com domain name.

4. On information and belief, EF is a company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

5. On information and belief, EF is also a provider of financial products and services.

**JURISDICTION AND VENUE**

6. The first and second Claims for Relief arise under the Lanham Act of 1946, as amended, 15 U.S.C §§ 1051 *et seq*. This Court has jurisdiction over these Claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1131 and 1338(a).

7. The third through fifth Claims for Relief arise under Colorado statutory and common law. This Court has jurisdiction over these Claims for Relief under 28 U.S.C. § 1338(b) in that these claims are joined with substantial and related claims brought under the laws (15 U.S.C. §

1114 *et seq*.) of the United States. This Court also has jurisdiction over these Colorado state law claims under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, because the federal and state claims are based on the same operative facts, and judicial economy, convenience, and fairness to the parties will result if this Court assumes and exercises jurisdiction over the state law claims.

8. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the jurisdictional amount exceeds $75,000, and Empower and EF are citizens of different states.

9. This Court has specific personal jurisdiction over EF due to its purposeful acts, transactions and business relationships within and directed toward the State of Colorado, which give rise to Empower's claims for relief and have resulted in harm to Empower within Colorado.

10. Empower is informed and believes, and thus alleges, that EF markets and sells its infringing products and services, as described in paragraphs 61-69, in and to consumers in the State of Colorado, including through the use of telemarketing, text messages, and other advertising campaigns directed specifically at Colorado residents, as discussed in further detail in paragraphs 74-84.

11. Empower is informed and believes, and thus alleges, that EF contracts with third parties to provide consumer deposit accounts to residents of Colorado.

12. EF's infringing products and services have resulted in significant actual confusion which has harmed Empower within Colorado, including by diverting significant resources located in Colorado, and harming the reputation in which Empower has invested significantly. Examples of such confusion are discussed in further detail at paragraphs 70-73.

13. Empower is informed and believes, and thus alleges, that EF contracts with third parties to provide hundreds of "in-network" ATMs physically located in Colorado, as discussed in further detail in paragraphs 80-82. Upon information and belief, these ATMs are intended for use by

Colorado residents and others located physically within the State of Colorado to conduct transactions using their EF accounts. EF promotes and provides information on these in-network Colorado ATMs through both its website, located at https://empower.me, and mobile app which is called "EMPOWER."

14. Empower is informed and believes, and thus alleges, that EF deposits funds to, and withdraws funds from, bank accounts located in the State of Colorado and owned by consumers residing in Colorado.

15. In April 2021, EF entered into an agreement ("the April 2021 Agreement") with Empower through which the parties undertook continuing obligations "[f]rom the Effective Date of th[at] Agreement," regarding how they would use the mark EMPOWER and reserved their rights, including for future enforcement if there should be a likelihood of confusion.

16. EF and Empower had numerous discussions through their lawyers, as well as discussions involving individuals located in Colorado prior to entry into the April 2021 Agreement. EF entered into this agreement with Empower with full knowledge that Empower's principal place of business was in Colorado.

17. On December 16, 2022, through its lawyers, EF contacted Empower to demand renegotiation of the parties' continuing obligations under the agreement.

18. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because EF is subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to Empower's claims occurred in this District.

## ALLEGATIONS OF FACT

### *Empower and the EMPOWER Marks*

19. With a history tracing back to 1891, Empower is the second-largest retirement plan provider in the United States. Empower supports the savings and investments of more than 17 million customers and helps over 70,000 organizations administer more than $1.2 trillion in plan assets.

20. Empower offers a myriad of financial services and related products to individual customers throughout the United States, including in Colorado. These include retirement and investment products and services, personal finance and portfolio management products and services, and advisory and educational resources.

21. Empower's retirement and investment products and services include two IRAs: the Empower Premier IRA and Empower Brokerage IRA, as well as the Empower Investment Account.

22. The Empower Premier IRA is an advisor-managed portfolio, with the Empower Brokerage IRA marketed towards more knowledgeable investors who prefer to manage their own portfolios.

23. The Empower Investment Account provides individuals access to commission-free online trading of stocks and exchange-traded funds ("ETFs"), as well as allows individuals to take advantage of unlimited funding so they can invest to meet financial goals without worrying about investment limits. A website snip from empower.com of Empower's Empower-branded retirement and investment offerings for individual consumers is included as Figure 1, below.



*Figure 1: Empower's Empower-Branded Retirement and Investment Offerings For Individual Customers, As Displayed On empower.com*

24.     Empower also offers personal finance and portfolio management products and services, including through Empower Private Client Solution, Empower Advisory Services and Empower's My Total Retirement product, as well as an associated personalized dashboard.

25.     Empower Private Client Solution provides individuals with a customized managed portfolio and team to monitor and manage individuals' investments and assets according to an individualized strategy aligned with personal financial goals, and including with respect to tax optimization, legacy and estate planning consultation, and access to private equity.

26.     Empower Advisory Services assists employers and plan sponsors in meeting their fiduciary obligations as well as provides tailored solutions to individuals to help meet their financial goals.

27.     And Empower's My Total Retirement product pulls real-time data from all of a participant's income sources, savings and investment accounts, integrating those factors with

demographic data into a planning experience using the input of investment professionals and Empower proprietary technology, blending a traditional retirement managed account with a digital and mobile multi-touch experience.  These services integrate with Empower's personalized dashboard, which displays an individual's full financial picture including savings, income, assets, spending and debt, as well as student loan debt guidance.  An image of Empower's personalized dashboard is included as Figure 2.

*Figure 2: Empower's Personalized Dashboard, As Displayed On A Desktop, Tablet And Mobile Phone*



28.    Empower additionally provides advisory and educational resources, including through Empower Insights, Empower Institute, and the Empower Wellness and Financial Center.

29.    Through Empower Insights, Empower publishes tips, articles and solutions designed to assist individuals in reaching their financial goals, with topics ranging from social security, mortgage rates and student loans to open enrollment, the housing market, the financial implications of major life events and estate planning.

30.     The Empower Institute aims to analyze and address the challenges and opportunities at the forefront of the American retirement landscape, providing insights and articles relaying its findings.

31.     And the Empower Wellness and Financial Center offers educational resources on a variety of topics, including financial budgeting, investing, estate planning, managing taxes, saving for the future, and financial considerations around life decisions such as marriage, having children, and transitioning to retirement.  An image of the Empower Wellness and Financial Center taken from empower.com is included as Figure 3.

*Figure 3: Empower Wellness And Financial Center*



32.     Empower's products and services are available online and can be accessed by participants via Empower's web-based platform, website, and also mobile application.

33.     Empower's mobile application, titled "EMPOWER," provides full account functionality, allowing customers to manage all their Empower accounts, including retirement plans, investment accounts and HSAs, in one place.

34.     Through the EMPOWER app, customers can make changes to their investment choices and contribution rates, as well as monitor the performance of their portfolio.

35.     The EMPOWER app also displays account balances, breakdowns of contributions to a customers' accounts, and customers' financial goals and progress.  It can also provide customers with comprehensive yearly snapshots of their accounts.  Screenshots of this functionality taken from the Apple App Store are included at Figure 4.



*Figure 4: Screenshots of Empower App Functionality*

36.     Empower has been operating under the "EMPOWER" brand since at least as early as 2014, long prior to any use by EF of a mark containing the term EMPOWER, and is the owner of

a family of EMPOWER marks, including numerous EMPOWER and EMPOWER-formative federal registrations covering its products and services.

37. Empower owns federal registrations (the "EMPOWER Registrations") for the following trademarks incorporating the term EMPOWER: 

(U.S. Reg. No. 5407837), EMPOWER RETIREMENT (U.S. Reg. No. 5256647), EMPOWER RETIREMENT (U.S. Reg. No. 5743480), EMPOWER HEALTH SAVINGS ACCOUNT (U.S. Reg. No. 6216958), EMPOWER HSA (U.S. Reg. No. 6064550), EMPOWER SELECT (U.S. Reg. No. 6043302), EMPOWER DYNAMIC RETIREMENT MANAGER (U.S. Reg. No. 6064551), EMPOWERUP (U.S. Reg. No. 6053841), EMPOWERup (U.S. Reg. No. 6053897), and EMPOWERup (U.S. Reg. No. 6053898). Copies of the Certificates of Registration issued by the United States Patent and Trademark Office ("USPTO") for the EMPOWER Registrations are attached as **Exhibit A**. These marks are registered in connection with various financial services, including financial record keeping, financial administration of pension and retirement plans, investment and retirement fund management, and mutual fund investment services.

38. Empower also owns Colorado State Trademark Registration No. 20228290612 for EMPOWER (the "Colorado State Registration"). A copy of the corresponding Statement of Trademark Registration of a Reporting Entity is attached as **Exhibit B**.

39. Empower additionally holds common law trademark rights in the marks which are the subject of the EMPOWER Registrations and Colorado State Registration, as well as other EMPOWER and EMPOWER-formative marks, including but not limited to, EMPOWER INSTITUTE, EMPOWER PREMIER IRA, EMPOWER BROKERAGE IRA, EMPOWER

INVESTMENT ACCOUNT, EMPOWER PRIVATE CLIENT SOLUTION, EMPOWER INSIGHTS, EMPOWER ADVISORY SERVICES, EMPOWER BENEFIT CONSULTING SERVICES, EMPOWER WELLNESS AND FINANCIAL CENTER, EMPOWERING AMERICA'S FINANCIAL JOURNEY and EMPOWER alone (collectively "EMPOWER Common Law Marks"). These marks are used in connection with a variety of financial products and services overlapping with and/or closely related to the financial services associated with the EMPOWER Registrations, including but not limited to personal financial planning, individual financial advising, account tracking, policy insights, and actuarial consulting, including as described in paragraphs 20-35 above.

***Recognition and Renown of the EMPOWER Brand***

40. Empower has developed an enduring reputation and legacy of goodwill in the EMPOWER marks (the EMPOWER Registrations, Colorado State Registration, and EMPOWER Common Law Marks are collectively referred to herein as the "EMPOWER Marks"), and which the relevant consuming public, including in Colorado, has come to recognize and associate exclusively with the EMPOWER Marks, Empower, and Empower's financial products and services.

41. Empower has invested over $50 million in the United States alone, including in Colorado, promoting its EMPOWER-branded products and services on television, radio, online and print advertisements, brand sponsorships, and the operation of a U.S. website located at www.empower.com/.

42. In 2019, Empower secured a 21-year naming rights deal for the home stadium of the Denver Broncos, a venue which hosts many of the biggest games, concerts and events every year,

and on which the EMPOWER mark is proudly emblazoned, inside and out.  Representative images are included at Figure 5.

*Figure 5: Empower Field at Mile High*





43. In 2020, Empower launched its "Empower Retirement: Focus on today. Save for tomorrow." national television advertising campaign, which saw commercials air on Fox Business, CNBC, Bloomberg, ESPN, ESPN2, and the Golf Channel.  *See* Figure 6.  Empower also launched a corresponding promotional campaign which aired on National Public Radio.



*Figure 6: Screengrab from Empower Advertising Campaign*

44.    Empower currently sponsors several world-class athletes, including legendary Denver Broncos safety and Pro Football Hall of Famer Steve Atwater, Ladies Professional Golf Association ("LPGA") Tour champion Cheyenne Knight and golfer Mariah Stackhouse, Professional Golfers' Association ("PGA") Tour champion Brendon Todd, and PGA Tour golfers Davis Riley, Webb Simpson, Robert Streb, and Brendan Steele.  Images of these athletes wearing

Empower-branded apparel and appearing in Empower content are included at Figures 7 and 8, below.

*Figure 7: Sponsored Athletes Stackhouse and Riley Wearing Empower-Branded Apparel*

*Figure 8: Empower Partner and Former Denver Broncos Safety Steve Atwater In Video For Empower*



45.     Additionally, Empower has partnered with three National Football League ("NFL") teams: the Denver Broncos, the Kansas City Chiefs, and the New England Patriots, on marketing campaigns including naming rights, in-stadium branding and signage, media advertising, sponsorship of team alumni events, and access to playoff games and offseason NFL events. Empower also sponsored the New England Revolution, a Major League Soccer ("MLS") team. And Empower currently holds a marketing partnership with Boston College, enjoying digital and social media opportunities, radio, in-stadium branding, signage and hospitality benefits in exchange for its support of the university's student athletes in football, basketball and hockey. *See* Figure 9.

*Figure 9: Empower In-Stadium Branding at Boston College's Conte Forum*



46.     Empower has also partnered with The Economist to publish a series of co-branded white papers aimed at improving relationships between employees and their employers for greater

financial success.  And Empower also produces an annual study: Empowering America's Financial Journey, analyzing the behavior of approximately 4.3 million active defined contribution ("DC") participants to better understand their savings habits and retirement planning goals.  Empower has received significant national media coverage resulting from this study, including articles in *The New York Times*, Bloomberg, Yahoo, and PLANSPONSOR, among others.

47.    Empower has been recognized in the financial services industry for the quality of its services.  Empower earned 28 "Best in Class" ratings from plan sponsors in the 26th annual PLANSPONSOR DC Survey, in key areas including plan design flexibility, online financial wellness offering, website, reporting tools, and fee value and transparency.  In 2022, the Financial Advisor IQ Service Awards, derived from a survey of more than 900 financial advisors, acknowledged Empower in six categories: "Best Participant Tools," "Best Reporting," "Best Price," "Best Cybersecurity/Privacy," "Best Client Service," and "Best Overall."  A list of these recognitions and representative articles noting them are attached at **Exhibit C**.

48.    As a result of Empower's numerous sponsorships and partnerships, as well as its extensive sales, advertising, marketing, promotional efforts and varied awards and achievements, the EMPOWER Marks have become well-known and recognized by the relevant consuming public throughout the United States, including in Colorado, and serve as a source-identifier for Empower and its high quality, trustworthy financial products and services.

49.    Given the nature of Empower's products and services, the significant financial contributions that customers make in such products and services, and the importance of consumer confidence when offering financial products and services, the goodwill associated with the EMPOWER Marks is critical for maintaining trust and confidence in Empower's products and services.

***EF Enters the Market as an Informational Mobile Application***

50. In May 2017, EF launched as a mobile application collecting data from individual bank and credit card accounts and offering general recommendations to improve overall financial health. Examples of such advice included how to improve your credit score and providing information on average auto insurance rates in order to negotiate lower prices. At that time, EF did not allow users to create checking or savings accounts through EF, and it did not provide investment advice. EF's goal, at launch, was to "help millennials better manage their finances." *See* **Exhibit D**.

51. Up until at least June 2018, EF promoted itself as a "24/7 online personal financial assistant" and "money management application helping people better track their finances and investments." EF CEO Warren Hogarth stated that EF "was created to bring all your finances under one app and help you better understand your money and build wealth." *See* **Exhibit E**.

52. And in June 2018, EF appeared focused on an expansion into the cryptocurrency space, announcing a cryptocurrency exchange integration into its app, and a cryptocurrency leaderboard that would "showcase[] users performance and rankings amongst others in the Empower crypto community." *Id.*

53. In the same month that EF launched its mobile application, Empower contacted EF, expressing concern over its uses of EMPOWER and EMPOWER FINANCE and placing EF on notice of Empower's superior rights in those marks. Empower then warned EF that the parties "may be marching towards each other in the marketplace," that "[t]ime will tell what level of actual or likely confusion exists or develops," and that it would be "vigilantly monitoring the situation." Empower expressly reserved all of its rights.

54. Between 2017 and 2021, the parties continued to exchange correspondence and communications, including directly between EF CEO Warren Hogarth and Colorado-based

Empower employees, relating to Empower's concerns over EF's use of EMPOWER and its encroaching expansion of offerings in the financial services space.

***EF Files For – And Withdraws – EMPOWER Trademark Applications***

55. On July 2, 2019, EF filed the following trademark applications with the USPTO (collectively, the "EF Applications"):

- U.S. App. Ser. No. 88498335 for the mark Empower in connection with "personal credit and lending services, namely, providing personal loans and lines of credit; credit card services, namely, issuing credit cards, payment processing, and transaction processing"; and
- U.S. App. Ser. No. 88975888 for the mark Empower in connection with "downloadable software for use in electronically managing personal financial transactions, budgets, and payments; downloadable computer software for online personal banking, transaction management, financial planning, financial management, bill tracking, and expense tracking; downloadable and recorded computer software for providing banking, financial, and payment alerts; downloadable computer software for enabling users to retrieve personal financial account balances and financial transaction information via a mobile application; cash management services, namely, personal budgeting services; online personal banking services; financial consulting services using both human and machine learning intelligence; financial information provided by electronic means in the field of finance, budget and spending reporting; providing financial services alerts, reports, transactions, and decision-making information using AI technology; personal financial transaction services, namely, budget planning in the nature of transaction tracking."

56. Empower opposed the EF Applications before the Trademark Trial and Appeal Board ("TTAB") ("Empower Oppositions") on the grounds that those applications created a likelihood of confusion with certain of the EMPOWER Registrations and EMPOWER Marks.

57. EF elected to withdraw the EF Applications. As a result, the EF Applications were abandoned by EF following the Empower Oppositions, and EF has not since filed any trademark applications incorporating the EMPOWER mark.

58. Contemporaneously with the abandonment of the EF Applications, EF entered into an agreement with Empower under which both parties expressly reserved all rights, including with respect to any future potential actual confusion, but also agreed to undertake certain continuing obligations.

59. On December 16, 2022, EF wrote to Empower confirming the parties had agreed to "postpone[] any resolution of the potential confusion that might arise from [the parties'] respective uses of their Empower-formative marks" and stating that EF wanted to "re-engage in [] discussions."

60. While Empower has at every turn sought to resolve this dispute amicably, due to the growing evidence of actual confusion that Empower has more recently received as a direct result of EF's encroachment into Empower's field of use, much of which is reputationally damaging as well as harmful to consumers, Empower filed the instant action.

***EF Continues Expansion, Resulting in Increased Consumer Confusion and Complaints***

61. Since its 5-person launch in 2017, EF has sought to redefine its services contemporaneously with various rounds of private equity funding. It launched in 2017 with an undisclosed amount of seed funding from investors. In March 2020, it received $20 million of Series A funding. And it recently closed $150 million in Series B funding in September 2022. *See* **Exhibit F**. EF's Series A and Series B funding have fundamentally transformed the scope and nature of its business.

62. Following its Series A funding, on March 5, 2020 EF issued a press release referring to itself as "Empower" and describing its business for the first time as follows:

> Empower's instantaneous digital intelligence is complemented by human coaching to guide customers through more difficult or unique financial challenges Millennials face, **including planning for retirement**…

*See* **Exhibit G** (press release announcement from EF) (emphasis added).

63.   In 2020, EF also launched "Empower Cash Advance": a new service offering pre-payday cash lending of up to $250 to be repaid automatically through a user's next paycheck deposit.  An image taken from empower.me displaying EF's Empower Cash Advance offering is included at Figure 10.



*Figure 10: EF's "Empower Cash Advance" Offering*

64.   While EF claims that Empower Cash Advance is not a payday loan, EF describes this service as "your money coming to you before payday," and directs this service at consumers who are "strapped for cash," noting "Empower will float you up to $250 when you need it most… Just pay us back when you get your next paycheck."  Examples of EF's advertising of its Empower Cash Advance product are included at Figure 11.



*Figure 11: EF's Advertising of Empower Cash Advance*

GET CASH ADVANCE UP TO $250*
Tight on cash and tired of asking friends to cover you? Empower will float you up to $250 when you need it most. Instant delivery available. No interest, no late fees, no credit checks. Just pay us back when you get your next paycheck.

65. And while EF advertises its Empower Cash Advance product as charging "no interest," it does charge users $8/month, or $96 annually, for the ability to obtain a cash advance of *up to* $250.

66. In May 2022, EF announced a new offering, "Empower Thrive," which purports to offer a revolving line of credit. EF has indicated Empower Thrive will be launched in the first quarter of 2023, and currently features it as "coming soon" on its homepage. An image taken from empower.me displaying EF's Empower Thrive offering is included at Figure 12.



*Figure 12: EF's "Empower Thrive" Offering*

67.   While EF advertises Empower Thrive as offering "0% APR," the fine print indicates Empower will in fact charge consumers **35.99% APR** on any balance not paid by a user's next paycheck date.

68.   In connection with these vastly expanded products and services, EF has evolved its online presence to focus on the EMPOWER mark.  For example, EF initially used the Twitter handle @_empowerfinance in 2017 to promote its products and services.  In 2018, EF changed its Twitter handle to @empowermeapp.  Now, EF uses the handle @EmpowerHQ, and refers to itself as Empower in its title card.  EF also refers to itself as Empower on its LinkedIn page, TikTok (with the handle @empower), Facebook profile (with the handle @EmpowerHQ), and as @empowerhq on Instagram.  Images of EF's social media handles taken from EF's respective accounts are included at Figure 13.



*Figure 13: EF's Current Social Media Presence*

69. Through, among other things, the continued expansion of EF's products and services, including into the area of retirement planning, as well as its increased use and emphasis of the EMPOWER mark, EF has impermissibly encroached on Empower's rights in the EMPOWER Marks, offering products and services that confuse and potentially mislead consumers and harm Empower's reputation, including in Colorado.

70. This more recent encroachment has led to dozens of reported instances of actual consumer confusion.

71. In one example, an EF customer contacted Empower, asking "**why we were taking $8 a month out of his checking account**." In another, an EF customer contacted Empower, "**wanting 'Empower Inc.' to stop pulling money out of her checking account**." In yet another example, an Empower customer contacted EF seeking her 1099, and providing personal identifying information for that purpose. And in yet another example, a consumer recently contacted Empower regarding over $450 in debits from her bank account over two consecutive days (including a charge for $250, specifically), at least one of which appeared on her bank statement as originating from "Empower Advance San Francisco, CA."

72. Many of these instances of confusion have resulted in angry customers, concerned about unknown charges and withdrawals from their bank accounts, often resulting from their mistaken download of EF's app instead of Empower's app. In their confusion, customers have also shared sensitive personal information, such as their social security numbers, dates of birth, address and account numbers with the incorrect company.

73. The actual consumer confusion generated by EF's use of the EMPOWER Marks has also diverted significant resources away from Empower's customer service and fraud departments which have a substantial presence in Colorado, and which have been required to address the results of this confusion and associated reputational harm.

***EF Builds Ties To Colorado And Targets Colorado Consumers Specifically***

74. On information and belief, and as it has expanded its products, services and use of EMPOWER, EF has also expanded and directed its marketing, advertising, and provision of services to Colorado residents specifically.

75. For example, Empower is informed and believes, and thus alleges, that EF has conducted telemarketing activities in Colorado, including through the use of Denver-area telephone numbers which appear to, but do not, originate from Empower.

76. In an exemplary instance, a Colorado resident received three calls on three consecutive days on her Colorado phone line from a number with a Denver area (303) area code, and which caller ID identified as "Empower." When the Colorado resident answered the third such call, she was informed her "**cash advance had been approved**."

77. Empower is informed and believes, and thus alleges, that EF was the source of this telemarketing call and other similar telemarketing activities targeting Colorado residents specifically.

78. EF also intentionally markets and provides its infringing EMPOWER-branded products and services in Colorado and to Colorado residents specifically.

79. On information and belief, EF sends text messages to Colorado-area telephone numbers, marketing its various Empower-branded products and services specifically to residents of Colorado. In sending these marketing text messages, EF refers to itself as "Empower."

80. On information and belief, EF also contracts with third parties for the provision of ATM services, through which EF customers are able to conduct transactions utilizing EF accounts.

81. EF describes these ATMs as "in-network" for its customers, and provides a link via its website and mobile app to an "ATM finder" for customers to locate ATMs within specified geographic boundaries. *See* **<u>Exhibit H</u>**.

82. That ATM finder identifies at least 100 such "in-network" ATMs in the Denver, Colorado, area alone, with hundreds located across the state more broadly, and which ATMs are intended for use by Colorado residents and others located physically within the State of Colorado

to conduct transactions using their EF accounts. *See* **Exhibit I**, listing hundreds of "in-network" ATMs located in and around the five most populous cities in Colorado, and Figure 14, displaying those ATMs in the Denver, Colorado area, specifically.

*Figure 14: Map Showing EF's "In-Network" ATMs in Denver, Colorado Area*

CREDIT UNION OF COLORADO
Location Details Actions
CREDIT UNION OF COLORADO
1525 SHERMAN STREET
DENVER, CO 80203
Distance: 0.09 miles

83. On information and belief, EF also deposits funds to and withdraws funds from bank accounts located in Colorado, and belonging to residents of Colorado.

84. Upon information and belief, EF has sold, offered to sell, promoted and/or marketed personal finance and financial planning products and services under marks which are confusingly similar to the EMPOWER Marks, including in Colorado.

85. Upon information and belief, EF deliberately selected "Empower" for its products and services, over time expanding its branding, products and services progressively closer to those of

Empower, in an effort to trade off of the goodwill, reputation and success of Empower, the EMPOWER Marks and Empower's products and services.

86. EF has no permission or authority from Empower, directly or indirectly, to utilize the EMPOWER Marks, or to license others to do so.

87. For the reasons detailed above, EF's activities infringe Empower's rights in the EMPOWER Marks, constitute unfair competition and deceptive business practices against Empower, and give rise to the claims set forth below.

**COUNT ONE**
***Federal Trademark Infringement***
15 U.S.C. § 1114(1)

88. Empower incorporates paragraphs 1 through 87, as if fully set forth herein.

89. Empower owns the EMPOWER Registrations.

90. The marks which are the subject of the EMPOWER Registrations are inherently distinctive, and further, U.S. Registration No. 5256647 is incontestable.

91. EF has used and continues to use in commerce marks which are identical or confusingly similar to the marks which are the subject of the EMPOWER Registrations in connection with the sale, offering for sale, advertising and marketing of financial products and services, and which use is likely to cause confusion, or to cause mistake or to deceive, in violation of the Lanham Act, 15 U.S.C. § 1114.

92. Empower has been, and will continue to be, damaged by EF's acts of infringement in an amount to be determined at trial.

93. EF's acts have been committed with knowledge of Empower's exclusive rights and goodwill in the EMPOWER Registrations.

94. Upon information and belief, EF's conduct is willful, deliberate, intentional and in bad faith.

95. As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the marks that are the subject of the EMPOWER Registrations. Empower has no adequate remedy at law and is entitled to injunctive and other relief.

**COUNT TWO**
***Federal Unfair Competition***
15 U.S.C. § 1125(a)(1)(A)

96. Empower incorporates paragraphs 1 through 95 as if full set forth herein.

97. Empower owns the EMPOWER Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Marks.

98. The EMPOWER Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

99. EF has and continues to use in commerce marks which are identical or confusingly similar to the EMPOWER Marks in connection with the sale, offering for sale, advertising and marketing of financial products and services, which use is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection or association of EF with Empower or as to the origin, sponsorship or approval of EF's services or commercial activities by Empower, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

100. Upon information and belief, EF's conduct is willful, deliberate, intentional and in bad faith.

101. As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the EMPOWER Marks. Empower has no adequate remedy at law and is entitled to injunctive and other relief.

**COUNT THREE**
***Common Law Trademark Infringement Under Colorado Law***

102. Empower incorporates paragraphs 1 through 101 as if full set forth herein.

103. Empower owns the EMPOWER Common Law Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Common Law Marks.

104. The EMPOWER Common Law Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

105. Empower has established goodwill associated with its EMPOWER Common Law Marks, and EF is trading upon Empower's goodwill therein through the unauthorized and unlicensed use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks.

106. EF's intentional, unauthorized use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks in connection with the sale, offering for sale, advertising and marketing of its financial products and services is likely to cause confusion, or to cause mistake or to deceive, in violation of Colorado common law.

107. EF's intentional, unauthorized use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks in connection with the sale, offering for sale, advertising and marketing of financial products and services constitutes infringement of Empower's preexisting, superior and longstanding common law rights in the EMPOWER Common Law Marks, which Empower acquired in good faith.

108. EF has willfully, deliberately, maliciously, intentionally, knowingly and in bad faith violated – and continues to violate – Empower's common law rights in the EMPOWER Common Law Marks.

109. As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the EMPOWER Common Law Marks. Empower has no adequate remedy at law and is entitled to injunctive and other relief.

**COUNT FOUR**
***Common Law Unfair Competition Under Colorado Law***

110. Empower incorporates paragraphs 1 through 109 as if full set forth herein.

111. Empower owns the EMPOWER Common Law Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Common Law Marks.

112. The EMPOWER Common Law Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

113. Empower has established goodwill in its EMPOWER Common Law Marks, and EF is trading upon Empower's goodwill therein through the unauthorized and unlicensed use of marks which are identical to or confusingly similar with the EMPOWER Common Law Marks.

114. EF has misappropriated the EMPOWER Common Law Marks in connection with use of identical or confusingly similar marks in connection with financial products and services, and in order to exploit and trade off Empower's goodwill and reputation in the market.

115. EF's conduct, including as described above, has caused and will continue to cause mistake or confusion or to deceive as to the affiliation, connection, and/or association of EF with Empower or as to the origin, sponsorship or approval of EF's services or commercial activities,

and/or as to the nature and quality of EF's infringing services, in violation of Colorado common law.

116. Upon information and belief, EF's unfair and unlawful conduct, including as described above, was deliberate, knowing and in willful disregard of Empower's intellectual property rights.

117. EF's intentional and willful actions set forth above constitute unlawful "passing off" under Colorado unfair competition common law.

118. EF's actions have caused and will continue to cause irreparable injury to Empower and have resulted and will continue to result in unjust enrichment of EF unless EF is restrained and/or enjoined by the Court from further violations of Empower's rights.

119. As a result of EF's acts, EF has caused, and will continue to cause, irreparable harm to Empower and the goodwill associated with the EMPOWER Common Law Marks. Empower has no adequate remedy at law, and is entitled to injunctive and other relief.

**COUNT FIVE**
***Deceptive Business Practices Under Colorado Law***
Colo. Rev. Stat. § 6-1-105

120. Empower incorporates paragraphs 1 through 119 as if full set forth herein.

121. Empower owns the EMPOWER Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Marks.

122. The EMPOWER Marks are inherently distinctive, and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

123. Empower has established goodwill associated with the EMPOWER Marks, and EF is trading upon Empower's goodwill therein through unauthorized and unlicensed use of marks which are identical to or confusingly similar with the EMPOWER Marks.

124.  In the course of EF's business, EF has used deceptive representations and advertising and marketing practices in connection with its products and services by using marks which are identical or confusingly similar to the EMPOWER Marks.

125.  EF is knowingly making a false representation as to the source, sponsorship, approval or certification of its products and services through its unauthorized use of marks which are identical or confusingly similar to the EMPOWER Marks.

126.  Further, EF is knowingly making a false representation as to affiliation, connection or association with or certification by Empower through its unauthorized use of marks which are identical or confusingly similar to the EMPOWER Marks.

127.  Additionally, EF is knowingly passing off its products and services as those of Empower through its use of marks which are identical or confusingly similar to the EMPOWER Marks without authorization from Empower.

128.  EF uses such deceptive representations and advertising and marketing practices with the intent to induce consumers to transact with EF under the mistaken impression that EF is affiliated with, connected to, or associated with Empower.

129.  EF's intentional and willful actions set forth above constitute unlawful and deceptive business practices under Colo. Rev. Stat. § 6-1-105.

130.  EF's actions have caused and will continue to cause irreparable injury to Empower and have resulted in and will continue to result in unjust enrichment of EF unless EF is restrained and/or enjoined by the Court from further violations of Empower's rights.

131.  As a result of EF's acts, EF has caused and will continue to cause irreparable harm to Empower and the goodwill associated with the EMPOWER Marks, for which Empower has no adequate remedy at law.  Empower is thus entitled to injunctive and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Empower prays for the following relief from this Court:

A. Enter judgment in favor of Empower and against EF on all counts.

B. Permanently enjoin EF from directly or indirectly engaging in any further trademark infringement, unfair competition, or deceptive business practices against Empower, and from aiding, abetting, encouraging or inducing another to do so.

C. Order an accounting and order EF to pay over to Empower:

i. All monetary gains, profits, and advantages derived by EF for the acts complained of herein;

ii. Damages incurred by Empower, including enhanced damages (up to treble damages) as authorized by 15 U.S.C. § 1117;

iii. Punitive and exemplary damages to be determined by the Court after a full hearing on the merits; and

iv. Empower's costs and disbursements in this action, including reasonable attorneys' fees and prejudgment and post-judgment interest.

D. Award Empower any other or further relief that the Court deems just or appropriate.

## JURY DEMAND

Empower demands a trial by jury on all issues so triable.

Respectfully submitted this 9th day of January, 2023.

**HOGAN LOVELLS US LLP**

*/s/ Michael C. Theis*
Michael C. Theis
(Colorado Bar No. 17079)
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
Tel.: (303) 899-7300
Fax: (303) 899-7333
michael.theis@hoganlovells.com

Anna Kurian Shaw
Lauren B. Cury
Hadley Dreibelbis
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com
hadley.dreibelbis@hoganlovells.com

Rebecca Horton
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Tel.: (415) 374-2300
Fax: (415) 374-2499
rebecca.horton@hoganlovells.com

*Attorneys for Plaintiff Empower Annuity Insurance Company of America*